Gary Lee RAWLINGS, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–84–12.

Court of Criminal Appeals of Oklahoma.

June 29, 1987.

T. Hurley Jordan, Public Defender of Okla. County, Oklahoma City, for appellant.

Michael C. Turpen, Atty. Gen., and Susan Stewart Dickerson, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

BRETT, Presiding Judge:

Appellant, Gary Lee Rawlings, was tried and convicted for the crime of Murder in the First Degree, in violation of 21 O.S. 1981, § 701.7, in the District Court of Oklahoma County, Case No. CRF–82–2697. The jury returned a verdict of guilty and set punishment at life imprisonment. The trial court sentenced the appellant in accordance with the jury's verdict. Appellant appeals to this Court. A detailed statement of facts is required.

Sally Brown and Gary Rawlings met one another in Pennsylvania in 1976. They were married at his parent's home in Denver, Colorado, in 1977. Sally maintained no contact with her family after this point. A daughter, Kimberly Ann Rawlings, was born to the couple in 1980. The appellant, Sally and Kimberly moved to Oklahoma City in late 1981. The marriage had been under quite a strain during this time. The appellant had a bad temper and occasionally beat Sally. In January 1982, Sally and Kimberly moved into the Passageway, a Y.W.C.A. Shelter for battered women. While there, Sally engaged in counseling sessions. Sally had a previous history of mental health problems. The counselors diagnosed Sally to be suffering from post traumatic stress disorder. At trial, the counselor explained that psychotic behavior was symptomatic of this disorder.

On January 12, 1982, Sally filed for divorce, and on February 24, 1982, a waiver Decree of Divorce was entered, granting Sally custody of Kimberly.

Sally and Kimberly moved into the Kirkpatrick Hotel, located in downtown Oklahoma City, in February 1982. At trial, the owner of the hotel indicated that Sally desired to reside there because the doors were kept secure.

On the evening of March 21, 1982, the police were summoned to the Kirkpatrick Hotel. The appellant had been late in returning Kimberly after his scheduled visitation. At approximately 9:00 p.m., when appellant returned without Kimberly, an argument ensued and appellant struck Sally on the head, cutting her and leaving a large gash. Sally was taken to St. Anthony Hospital for treatment. Sally informed the police that appellant had taken some papers from her, including Kimberly's birth certificate. He had also told Sally upon his departure "that the next time she was to see him, she would be dead." Pursuant to negotiations by Sally's attorney, appellant returned Kimberly and agreed to refrain from exercising his visitation rights for six months.

Sally began a job with Kerr-McGee Corporation in late March. During the course of her two months employment, Sally proved herself to be a good employee. Her supervisors did notice that she stayed to herself. In fact, Sally was often overheard talking to herself, saying "Good-bye Gary." Another secretary testified that she once walked into the company bathroom and saw Sally speaking to herself in the mirror, as if she were two different persons.

In February, Sally enrolled Kimberly in a day care center. Every day Sally would take Kimberly to the center at 8:00 a.m. and return for her after work between 5:00 and 5:30 p.m. This daily routine was verified at trial by Sally's neighbors.

In early May, Sally sought to determine whether she qualified for a rent subsidy program operated by the Oklahoma City Housing Authority. Sally made an appointment for May 27, 1982. Sally also contacted a private firm offering assistance in locating rental properties. She paid a $45.00 fee and signed a policy agreement.

On Wednesday, May 26, 1982, Sally commenced her daily work routine. She and Kimberly ate breakfast at the cafe in the Kirkpatrick Hotel. Sally then dropped Kimberly off at the day care center at the usual time. Sally Rawlings has never been seen since.

Sally never returned to pick Kimberly up. She never returned to the Hotel or made any arrangements for her personal belongings. She never picked up her mail or requested that it be forwarded. She never arrived for work that day or any day since. She never contacted Kerr-McGee to receive her wages due. She never withdrew any of her money in the bank. She did not keep her appointment with the Oklahoma City Housing Authority, nor did she ever contact the private firm she had paid to help her locate a home.

It was then documented at trial that the appellant had traveled to Oklahoma City and stayed at the Bel Aire Motel around May 4, 1982. On May 11, 1982, while at his parents' home in Lakewood, Colorado, he called the same motel to make reservations for the two nights of May 24 and 25, 1982. He, in fact, stayed at the motel on those two nights.

On May 24, 1982, prior to leaving Colorado, the appellant purchased twenty-five $20.00 traveler's checks. Upon arrival in Oklahoma City that same afternoon, he rented a yellow car from a car rental agency.

A car rental employee, who picked up the appellant when he arrived in Oklahoma City, testified that the appellant was carrying with him a blue suitcase and a fold-over bag. The appellant's mother testified that when she drove the appellant to the Denver airport on May 24, 1982, he left with a blue suitcase and a sleeping bag. He told his mother that he needed the sleeping bag to stay over at a friend's house while in Oklahoma City. He indicated to his mother that he was coming to Oklahoma City to visit Kimberly.

On May 24 or 25, 1982, a man identifying himself as Kimberly's father called the day care center to inquire about what would happen if Sally were not able to pick up Kimberly in the evening. He was informed that the director of the center would take Kimberly home. One employee of the day care center testified that within this same week in May, she observed an empty yellow car parked near the center.

During the week of May 24, 1982, the appellant responded to an Oklahoma City newspaper ad and purchased a .44 Magnum handgun. The seller of the gun testified that the appellant indicated he wanted the gun for squirrel hunting. He also testified that during the course of the sale, the two men discussed an episode of the television program "Quincy" in which a murder had been disguised to seem accidental. The owner sold the gun and nine rounds of ammunition for some cash and three traveler's checks.

The appellant, a commercial airline pilot, arranged to rent a plane from Charter Air, Incorporated, in Oklahoma City, upon six occasions during the month of May 1982. On all but the last occasion, May 26th, those rentals were cancelled. On that day, the appellant drove to the airport in the yellow rental car. He parked and left the car where the airplane had been parked rather than in the designated automobile parking lot. The airplane was not returned by the appellant until early the next morning. The appellant claimed only 2.4 flying hours; however, an employee at the air lines discovered an 8 hour discrepancy between the tack time and the Hobbs meter time on the airplane. Subsequently, the Hobbs meter was discovered to be disconnected. Additionally, the airplane's gas cap and some inside carpeting were missing.

The appellant's itinerary of May 26 and 27 was established at trial through employees of various airports. On May 26th between 2:00 and 2:30 p.m., the appellant refueled the rented airplane at Redbird Airport in Dallas, Texas. He purchased 20.3 gallons of fuel and some velour cleaner. He also made two phone calls while he was there, each verified by telephone company records. One of the calls was to his employer in Denver. The second call was to the day care center. During this call, he identified himself as Gary Rawlings, Kimberly's father, and asked the worker to have the director take Kimberly home for the night, because Sally would not be able to pick her up that evening.

Later, the same afternoon, the appellant purchased fuel at Andrau Airpark in Houston, Texas. This time he purchased 18 gallons. An attendant there noticed a large cloth bundle in the rear baggage compartment of the airplane.

Later, that evening, the appellant purchased 19 gallons of fuel at Lakeside Airport near Houston. Subsequently, attendants there found an unclaimed gas cap. Around 11:00 p.m. on May 26, 1982, the appellant purchased 18.4 gallons of fuel at Meacham Field in Fort Worth, Texas. The attendant who serviced the appellant's plane noticed that the fuel cap was missing. Payment for all the fuel was made by traveler's checks.

On the morning of the 27th, the appellant returned the yellow car complaining that he had had trouble starting it and requested a different car. The agency rented him a blue car. A couple of employees of the company drove the yellow car over the weekend, but they were unable to discover any problem with the car. Another employee of the company testified that a mat in the bed of the trunk of the yellow car was missing after the appellant rented it. A subsequent search of the yellow car uncovered a receipt which had an itinerary of things to be done. Experts testified the handwriting as the appellant's. The last thing to do on the list was to put the suitcase in a locker.

The appellant then went to ABC Moving Company, where he obtained an order for service to move Sally's furniture to Denver, where he indicated Sally had moved. Some days later, the company received an envelope postmarked June 1, 1982, allegedly from Sally Rawlings. Inside the envelope were two money orders, a letter authorizing the movers to retrieve Sally's items from the Kirkpatrick Hotel, a letter to the hotel authorizing entry by the movers and the completed order for service, previously given to the appellant.

Around lunchtime on May 27, 1982, appellant arrived at the day care center in the blue rental car. He presented the day care worker with a letter allegedly from Sally indicating that she was moving to Florida and leaving Kimberly in his care. Kimberly was turned over to her father.

On June 3, 1982, Kerr-McGee received a resignation letter allegedly prepared by Sally. The firm's personnel supervisor testified at trial that she thought the letter was unusual because it was not accompanied by a customary pre-printed document from Sally's supervisor. Subsequent efforts to match the type of the letter with any of the typewriters accessible to Sally were unsuccessful.

At trial, an expert testified that the resignation letter was typed on a typewriter from the appellant's place of employment. A co-worker of the appellant also testified that he had seen the appellant on May 30, 1982, using that typewriter or one of the same make.

Before leaving Oklahoma City with Kimberly, the appellant called his mother, Loretta Rawlings, from the Oklahoma City Airport. He asked his mother to meet him at the Denver Airport and requested that she bring a uniform for him, as he had to return to work immediately.

When Loretta Rawlings met the appellant at the airport he had only the blue suitcase and a plastic bag carrying Kimberly's things. He did not return with the sleeping bag. He explained to his mother that Sally had gone to Florida with her boyfriend and had given him permission to keep Kimberly for 30 days. He put his suitcase in his mother's car and went out on his flight. Mrs. Rawlings took Kimberly to her home.

The next day Loretta Rawlings retrieved the suitcase from her car. She took it upstairs, opened it, and discovered a gun inside a box and some other unfamiliar belongings. She got scared, took the suitcase to her daughter's house, and from there the police were called.

Two Denver police officers arrived at the daughter's home. Mrs. Rawlings indicated to the first officer that arrived that she knew her son had killed his ex-wife. She retrieved the suitcase and showed the officers the gun and several items. Included among the items were: typewritten letters

to the movers and the Kirkpatrick Hotel, bearing Sally's signature, a can of velour cleaner, a set of keys—which were keys Sally used for her job at Kerr-McGee, Kimberly's birth certificate, a savings deposit book in Sally's name, a car rental receipt, and a photograph of Sally and Kimberly. Loretta Rawlings stated that the signatures on the papers were not Sally's and gave her opinion that the handwriting was that of the appellant.

At trial, Sally's blood type was established through analysis of her parents' blood and the blood of her twin brother. Human blood was found in and on the yellow car, the airplane, and the handgun. The process of electrophoresis was used to establish that blood found in the car and plane could have been Sally's blood but could not have been the appellant's blood.

A firearms expert testified at trial that the gun had been fired five times since it was last cleaned. The gun had four live cartridges when it was turned over to the police.

An FBI document examiner established that the typewriter, upon which the letters were allegedly prepared by Sally, was actually located at the appellant's place of business. He further established that Sally's alleged signature on those documents was executed by the appellant.

Another technical investigator identified a fingerprint on the envelope to the ABC Moving Company, allegedly mailed by Sally, as the appellant's fingerprint. He further identified a palm print on a money order in that envelope as the appellant's print.

The defense argued at trial that Sally was psychotic and disappeared by her own free will. The State argued that the appellant killed his wife, put her body in the sleeping bag, flew out over the Gulf of Mexico, and dumped her body into the ocean. Sally Rawlings' body was never recovered.

Under his first proposition, the appellant argues that the trial court erred in failing to submit an instruction to the jury as to the weight and credibility to be given an expert witness. A review of the record reveals that no request for such an instruction was made.

In *Grimmett v. State*, 572 P.2d 272 (Okl. Cr.1977), this Court established its analysis concerning circumstantial evidence as follows: one, it is error for the trial court not to instruct the jury, even though no request is made, when all the evidence relied upon is circumstantial; two, when the evidence is both direct and circumstantial, it is not error to fail to give an instruction, when none is requested; and three, the failure to give an instruction where all of the evidence is circumstantial and no request is made, is not reversible error unless the evidence against the defendant is inherently weak. Therefore, to be reversible error, there must be no instruction given, and weak circumstantial evidence. *Pearson v. State*, 632 P.2d 765 (Okl.Cr.1981).

■ We are of the opinion that the present case contained strong circumstantial evidence. Furthermore, we find the evidence to be both direct and circumstantial. Therefore, applying the *Grimmett* analysis, we find no error in the failure to give an instruction.

The appellant's second assignment of error alleges that venue over the offense was not sufficiently proven, thereby rendering the verdict, judgment, and sentence void.

■ Criminal prosecution may be brought in the county where the evidence indicates the crime might have been committed, where uncertainty exists as to the county in which the crime was committed. Okla. Const. Art. II, § 20. *See also, Cooper v. State*, 671 P.2d 1168 (Okl.Cr.1983). The State's proof of venue in a criminal action need not be proven beyond a reasonable doubt but by a preponderance of the evidence. *Voran v. State*, 536 P.2d 1322 (Okl.Cr.1975). Venue may be established either by direct or circumstantial evidence. *Id.*

■ From a review of the record, we are of the opinion that the State met its burden of proof as to venue. The evidence suggests that the crime might have been com-

mitted in Oklahoma County. This assignment is without merit.

The appellant's next proposition alleges that the trial court committed fundamental error by failing to instruct the jury on the lesser degree of homicide that he requested.

■ This Court has repeatedly held that an instruction on a lesser included offense need only be given when there is evidence that tends to prove the lesser included offense was committed. *Foster v. State,* 714 P.2d 1031 (Okl.Cr.1986). Absent such evidence, an instruction should not be given. *Funkhouser v. State,* 721 P.2d 423 (Okl.Cr. 1986).

■ It is within the trial court's discretion and responsibility to consider the evidence and to determine whether other such evidence exists to warrant instructions of a lesser degree. *Liles v. State,* 702 P.2d 1025 (Okl.Cr.1985). After a review of the record, we cannot say that the trial court abused that discretion.

The appellant's fourth assignment of error claims that the State presented insufficient evidence that a homicide occurred in order to sustain a conviction for murder.

■ The appellant correctly asserts that proof of a corpus delicti must be beyond a reasonable doubt. 21 O.S.1981, § 693. Corpus delicti means the actual commission of a particular crime by someone. *Cooper v. State,* 671 P.2d 1168 (Okl. Cr.1983). The State must prove the corpus delicti beyond a reasonable doubt by evidence other than a confession. *Parks v. State,* 651 P.2d 686 (Okl.Cr.1982). It is not necessary that the corpus delicti should be established by direct and positive proof. It may be proved as well by circumstantial evidence, if on all the evidence, the jury is satisfied of the defendant's guilt beyond a reasonable doubt. *Brown v. State,* 9 Okl.Cr. 382, 132 P. 359 (1913).

■ In a prosecution for homicide, the corpus delicti consists of two fundamental and necessary facts: first, the death; second, the criminal agency of another as the cause for that death. *State v. Edmondson,* 536 P.2d 386 (Okl.Cr.1975).

As applied to this case, it was necessary to show, first, that Sally Rawlings died from the effects of a wound, and second, that the wound was unlawfully inflicted by the defendant.

When the sufficiency of the evidence presented at trial is challenged on appeal, as it is here, the proper test is whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of facts could have found the essential elements of the crime charged beyond a reasonable doubt. *Spuehler v. State,* 709 P.2d 202 (Okl.Cr.1985).

■ From a review of the record before this Court, we find the State's evidence more than sufficient to permit the jury's finding of guilt. We are of the opinion that the State met its burden of showing that Sally Rawlings died from the criminal agency of the appellant. This assignment is without merit.

Under the appellant's fifth assignment, he alleges the trial court erred by refusing to suppress the evidence found in his suitcase. The appellant asserts that this error violated the Fourth and Fourteenth Amendments of the United States Constitution.

The appellant cites *Rutledge v. State,* 545 P.2d 1257 (Okl.Cr.1976) for the rule that when two or more persons have an equal right to use or occupy premises, any one of them is capable of consenting to a search, except as to areas and property personal to the nonconsenting individual, not under joint possession or control. The appellant asserts that the police went beyond the area common to mother and son by searching his suitcase in which he had a reasonable expectation of privacy.

In *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), the Supreme Court found no constitutional violation when the defendant's wife brought his guns and clothing out of their bedroom and turned them over to the police, without any request from the officers. The Court determined that her conduct did not amount to a search and seizure.

In assessing the appellant's claim that the officer's course of conduct in the case at bar amounted to a search and seizure, it is well to keep in mind that Loretta Rawlings initiated the police contact. It was she, without any police request, who delivered and surrendered Gary's belongings. In fact, the Denver and Oklahoma City police were not even aware that a crime had been committed, until summoned by Mrs. Rawlings. She explained her motive for calling the police as a certainty that her son had killed Sally Rawlings.

In *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410 (1980), the Supreme Court stated that a wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and ... such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully.

We cannot find the slightest implication from the record of an attempt by the officers to coerce or dominate Loretta Rawlings, or, for that matter, to direct or control her actions. They simply responded to her telephone call. We find no constitutional violation and therefore, no error.

In his next assignment, the appellant alleges that the trial court committed fundamental error by allowing testimony concerning the science of electrophoresis. The appellant further alleges that the witness was not qualified to testify as an expert.

Scientific evidence is admissible provided there is proof that the reliability of the tests used has gained general acceptance and recognition in the concerned scientific community. *Smith v. State,* 656 P.2d 277, 281 (Okl.Cr.1982). In *Plunkett v. State,* 719 P.2d 834 (Okl.Cr.1986), this Court held that the multisystem analysis of polymorphic enzymes by electrophoresis, used to classify bloodstains, was both sufficiently reliable and generally accepted in the scientific community. Therefore, the admission of this evidence was not error.

Furthermore, the record reveals that Brian Wraxall, the State's expert witness, was eminently qualified to testify regarding the procedure of electrophoresis. Mr. Wraxall was educated in London, England, where he obtained a Higher National Certificate in Applied Biology. He had twenty years experience in the study of forensic evidence, eighteen years of which were directed to the specialty of forensic serology. Mr. Wraxall had testified as an expert on electrophoresis in fourteen different states, including Oklahoma, and also federal court. Moreover, Mr. Wraxall explained in great length the process of electrophoresis and verified its acceptance in the scientific community.

Sufficient evidence therefore, was presented for the trial court to determine the qualification of Mr. Wraxall as an expert. The trial court's decision will not be disturbed absent a clear abuse of discretion. *Driskell v. State,* 659 P.2d 343 (Okl. Cr.1983). We find this assignment to be meritless.

The appellant argues under his seventh assignment that the trial court committed prejudicial error when it admitted into evidence a photograph showing the victim alive. The appellant asserts that the photograph had no probative value and was highly prejudicial.

The rule is that admissibility of demonstrative evidence such as photographs is a question of legal relevance for the trial court. When the probative value is not outweighed by the danger of prejudice to the defendant, the photographs are admissible. *Jacobson v. State,* 684 P.2d 556 (Okl.Cr.1984).

This Court has also repeatedly held that the question of whether the probative value of a photograph outweighs any possible prejudice is a matter falling within the sound discretion of the trial court. Absent a clear abuse of that discretion, this Court will not disturb the lower court's ruling. *Glidewell v. State,* 626 P.2d 1351 (Okl.Cr. 1981).

The evidence at trial indicates that the photograph was kept by Sally Rawlings at all times. She would take the photograph to work and place it on her desk. When she left for the night, or on week-

ends, she would take the photograph home with her. Her co-workers testified that Sally was very attached to the photograph. After Sally's disappearance, the photograph was discovered in the appellant's suitcase. Although this Court does not favor admissions of photographs showing the victim alive, we are of the opinion that the photograph was relevant as to its existence and the location of its discovery. We find no error.

Under the appellant's eighth proposition, he alleges that the trial court erred by admitting inflammatory hearsay evidence. Specifically, the appellant urges that the trial court erred by allowing witnesses to testify as to Sally Rawling's expressions to them of her fear of the appellant.

We find *Allen v. State*, 675 P.2d 456 (Okl.Cr.1984), to be controlling on this point. In *Allen*, the testimony complained of concerned that of witness Benson, who related that Ms. Moore (the victim) had told him that she was fearful that the appellant (her husband) would hurt her or her child if she continued to stay with him. Although we did agree that Mr. Benson's testimony was hearsay, we found it to be admissible as an exception to the hearsay rule, pursuant to 12 O.S.1981, § 2803(3), as showing state of mind.

■ Accordingly, the testimony concerning Sally's expressions of fear of the appellant were properly admitted, showing her state of mind. This assignment is without merit.

The appellant asserts under his ninth assignment of error that the trial court erred by admitting evidence of character not put in issue by the appellant. Specifically, the appellant urges that the hearsay testimony discussed under the previous assignment of error amounted to evidence of the appellant's character.

As this Court stated in *Manning v. State*, 630 P.2d 327 (Okl.Cr.1981), we have long recognized the principle that where hostile emotions at a particular time are to be proved in a case, the existence of the same emotion in the same person at another time is proper evidence. In marital homicide cases, a statement showing ill-feeling, threats, or similar conduct by one spouse toward the other is relevant to show motive or malice.

■ The record reveals that the appellant had committed previous acts of violence upon Sally Rawlings. Therefore, the testimony was relevant, as it most certainly shed light on the appellant's motive and aforethought. We find the marital homicide rule no less persuasive where the marital relationship has been severed by divorce, but the parties remain in close contact, such as in the present case.

The appellant's tenth assignment of error alleges that there was insufficient evidence to sustain the verdict, and the trial court erred when it failed to sustain the appellant's demurrer and motion for a directed verdict.

■ This Court has consistently held that the weight of all evidence, circumstantial as well as direct, is for the jury. We will not disturb the jury's verdict when there is evidence, albeit circumstantial, to support the verdict. *Fields v. State*, 666 P.2d 1301 (Okl.Cr.1983). It is our opinion that the circumstantial evidence presented in this case was sufficient for the jury to conclude that there was no reasonable hypothesis other than the appellant killed Sally Rawlings.

Furthermore, a motion for directed verdict admits any facts the evidence tends to prove. Where there is any competent evidence reasonably tending to sustain the allegations of the charge, the trial court should not sustain a motion for a directed verdict. *Lee v. State*, 661 P.2d 1345 (Okl.Cr.1983). We find this assignment to be without merit.

The appellant's final assignment alleges that the trial court committed error by admitting the hearsay testimony of a police officer. This testimony, as told to the officer by the mother, recounted a conversation between the appellant and his mother.

The testimony to which the appellant complains is:

A. [By Officer Neumeyer] ... and she [Loretta Rawlings] kept saying that

Gary talked to her about someday he was going to kill her [Sally Rawlings], and then kill himself, and the child would be raised properly by its grandmother.

Q. [By Prosecutor] Could you repeat that please?

A. Yes sir, she said that Gary talked about killing his ex-wife, and then killing himself. This way, with both of them out of the way, the child could be raised properly with the grandmother. And she said that's where Gary thought the child should be raised.

Hearsay is not admissible except as provided by law, 12 O.S.1981, § 2802. One provision of the law permitting admission of hearsay statements is the "excited utterance" exception, 12 O.S.1981, § 2803. That exception states:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \* \* \*

2. A statement relating to a startling event or condition made while the declarant was under the stress of excitment caused by the event or condition ...

■ The fundamental requirements that must be met for this exception to apply are: (1) a startling event or condition; (2) a statement relating to the startling event or condition; and (3) the statement must be made while the declarant is under the stress of excitement caused by the [event or] condition. 1 L.H. Whinery, *Oklahoma Evidence* 282 (1985). *See also, Griffith v. State,* 734 P.2d 303 (Okl.Cr. 1987), whereby this Court overruled *Byrd v. State,* 657 P.2d 183 (Okl.Cr.1983), and by implication overruled such part of *Bishop v. State,* 581 P.2d 45 (Okl.Cr.1978) that is inconsistent with *Griffith.* *Byrd* and *Bishop* had misapplied the third requirement of this exception.

The theory of this exception, which is succinctly explained by Whinery, is that the spontaneity of the statement in relation to the exciting event gives rise to trustworthiness. Unlike the present sense impression exception, the statement under the excited utterance exception need not be substantially contemporaneous with the startling

event or condition. Rather, it qualifies so long as the declarant is under the stress of excitement at the time the statement is made.

■ In the present case, the record reveals that the mother's statements to the officer were prompted by her discovery of the gun and other personal belongings of Sally Rawlings inside the appellant's suitcase. Loretta Rawlings' testimony at trial indicated that her daughter contacted the police and informed them that, "she [the daughter] wanted somebody there right now, that her mother was upset." Mrs. Rawlings further testified that the discovery of the gun was a "terrifying moment". We are of the opinion that this course of events constituted a startling event, thereby satisfying the first requirement.

The record also indicates that the mother's statements to the officer related to that startling event. This satisfies the second requirement. Finally, Mrs. Rawlings testified that when the officer observed the gun and remarked that it had been fired, she felt "petrified again." Therefore, the final requirement, that her statements be made while under the stress of excitement caused by the event, is satisfied.

It is our opinion that the mother's statements to the officer fall within this exception to the hearsay rule. We find the spontaneity of this statement in relation to the startling event to give rise to its trustworthiness. Moreover, we find it hard to imagine a mother fabricating a story under this amount of stress, which actually incriminates her son.

This Court is not unmindful of 12 O.S. 1981, § 2805. That section provides that hearsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule. However, we would be inclined to view the statement of the appellant to his mother of his intention to kill Sally Rawlings as an admission by a party opponent, under 12 O.S.1981, § 2801(4)(b)(1). That section provides that a statement is not hearsay if it is offered

against a party and is his own statement. The appellant's statement to his mother meets these requirements. It is his statement and it is offered against him. Therefore, that portion of the mother's statement to the officer containing the appellant's statement would not be hearsay and resort to § 2805 would be unnecessary.

Finally, we take time to observe the mother's affidavit, filed three years and three months later, which denies that her statements to the Denver Police Officers were ever made. The trial record denotes that Loretta Rawlings testified she could not remember exactly what she had said to the officers because of her emotional state. We find it reasonable to attribute her loss of memory at the time of trial to a mother's reluctance to convict her son by her own testimony. We also find it noteworthy that she was available at trial for the defense to call to rebut the police officer's testimony. The evidence strongly corroborated Loretta Rawlings' statements, and we tend to believe the reliability of her statements as given to the officers considering the stressful circumstances.

Accordingly, for the foregoing reasons, the judgment and sentence for the trial court is AFFIRMED.

BUSSEY, and PARKS, JJ., concur.