Merrit Allen ARNOLD, Appellant,

v.

STATE of Oklahoma, Appellee.

No. F–86–912.

Court of Criminal Appeals of Oklahoma.

Dec. 7, 1990.

Rehearing Denied Jan. 24, 1991.

Thomas Purcell, Asst. Appellate Public Defender, Norman, for appellant.

Robert H. Henry, Atty. Gen., Steven S. Kerr, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

LANE, Vice–Presiding Judge:

Merrit Allen Arnold, Appellant, was tried by jury and convicted of Murder in the First Degree (21 O.S.1981, § 701.7) in Wagoner County District Court, Case No. CRF–86–86. The trial court sentenced Appellant

to life imprisonment in accord with the jury's verdict. Appellant challenges the jury instructions, sufficiency of the evidence, judicial and prosecutorial conduct, delay in arraignment and the introduction of a tape recorded conversation into evidence. We find no error and affirm the judgment and sentence of the trial court.

The evidence presented at trial will be separated into three categories for the purpose of our analysis, circumstantial evidence of the *corpus delicti*, admissions against interest by the appellant introduced through other witnesses, and admissions against interest of the appellant obtained by electronic surveillance and introduced as a tape recorded statement. First we will present the circumstantial evidence of the *corpus delicti*.

Henry Copeland disappeared on September 11, 1984. He was last seen sleeping in a green and white 1973 AMC Hornet with his feet hanging out the window. Copeland had parked the car across from the appellant's home. Copeland never again was seen alive; his body was never found.

Copeland was Debra Munyon's former boyfriend; Debra Munyon was the appellant's former step-daughter. On the day before he disappeared Copeland had ordered Munyon to give him her daughter, or else he would take the girl and Munyon would never see her again. At that time Munyon and her children were staying at Appellant's home. This was not the first time Copeland had acted violently toward Munyon. In fact, his frequent violence was the reason Munyon left him. Several months earlier she had given him the Hornet as consideration for his promise to return to Kansas and leave her alone. Although she gave him possession of the car, she retained title.

On the morning Copeland disappeared Darlene Munyon, Debra's sister who was also staying with the appellant, heard several loud sounds which she described as car doors slamming or pans clanging together. Later that morning the appellant went to the home of his ex-wife, Betty Arnold, and borrowed her car in order to go and get gas for the Hornet. When he returned he asked her to wait forty-five (45) minutes and then follow him to his father's property near Lake Tenkiller. When she arrived she noticed the appellant had blood and dirt on his pants. He told her to go home. Later Betty Arnold met the appellant at Morgan's Corner in Wagoner County and they moved the Hornet to the White Horn Cove area of the county. The next day Betty Arnold helped the appellant take the car to Brown's Storage.

Francis Duane Munyon, Betty Arnold's son, testified that he saw the car in Brown's Mini Storage. He also said that he wore gloves that the appellant gave him so that he would not get fingerprints on the car.

The car remained in storage from September 12, 1984, until sometime in April, 1985. During that time rent was paid at approximately thirty dollars ($30.00) per month. In April, the appellant sold the car for salvage for twenty-five or thirty dollars ($25.00–$30.00). When he sold the car the fabric from the seats, a door panel, the floor mats, and the fabric in the trunk area had all been stripped out.

Although the appellant was scheduled to work his route as a truck driver for Tony's Pizza on September 11 and 12, 1984, he did not show up for work. He returned to work on September 13, 1984.

After the trial court ruled sufficient evidence was presented to establish the *corpus delicti*, Appellant's admissions against interest were admitted into evidence. Early in the morning of Copeland's disappearance, the appellant told his ex-wife he had shot Copeland and asked her to help him dispose of Copeland's body. The appellant later told his ex-wife he had killed Copeland. The appellant showed Debra Munyon a spent bullet and told her that Copeland would not bother her any more. He also told her he had buried Copeland. The appellant told Francis Duane Munyon and his ex-wife that he had shot Copeland six times with a .38 caliber gun while Copeland was sleeping in the Hornet and killed him.

Betty Arnold went to the police sometime later to tell what she knew about the disappearance of Copeland. She consented to

the planting of an electronic surveillance "bug" in her living room and invited the appellant to her home. While there he answered her many questions about the murder. The resulting tape recording was admitted into evidence at trial.

 Appellant first contends the trial court erred by refusing his requested instructions regarding first degree manslaughter and second degree murder. These instructions are warranted only if the evidence supports them. *See Fox v. State*, 686 P.2d 292 (Okl.Cr.1984). First degree manslaughter is defined as a homicide perpetrated without design to effect death, and in the heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon. 21 O.S.1981, § 711(2). No evidence presented at trial supports this instruction.

Second degree murder is defined by statute as a homicide perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, and carried out without premeditated design. 21 O.S.1981, § 701.8. Again, no evidence presented at trial supports this instruction. Appellant asks us to speculate on the various ways Copeland's murder could fit either of these lesser crimes. However, the trial judge properly made his ruling on the evidence before him. *See Fox, Id.*

 Appellant next argues insufficient evidence of the *corpus delicti* independent of his own recorded statements was presented at trial to support a conviction. We begin with the recognition that a body need not be found in order for the crime of murder to be proven. *See Rawlings v. State*, 740 P.2d 153 (Okl.Cr.1987). Circumstantial evidence may be used to prove the *corpus delicti. Id.* In this case all of the evidence of the *corpus delicti* is circumstantial except Appellant's own recorded statement and his admissions against interest introduced after the trial court ruled that sufficient evidence of the *corpus delicti* was established. We find, as did the trial court, that the circumstantial evidence outlined above was indeed sufficient to establish the *corpus delicti* and open the door for the admission of Appellant's admissions against interest.

 Appellant also contends the state presented no evidence that the murder was premeditated. Unfortunately the state offers us no guidance as it does not respond to this argument. We begin with the understanding that intent, like all states of mind, almost always will be proved, if at all, by circumstantial evidence. *See e.g., Koonce v. State*, 696 P.2d 501 (Okl.Cr. 1985); *Short v. State*, 634 P.2d 755 (Okl.Cr. 1981). Since the only admissible evidence regarding intent is circumstantial, the State's evidence must exclude every reasonable hypothesis except that of malice aforethought. *See Cavazos v. State*, 779 P.2d 987 (Okl.Cr.1989). (burden of proof applicable to circumstantial evidence). The circumstantial evidence of intent includes the appellant's statement to Francis Duane Arnold and his ex-wife that he shot Copeland six (6) times. The facts also present a strong motive for the appellant to shoot Copeland. The appellant continued his fatherly relationship with his adult step-children who lived with him, even after their mother and he divorced. Copeland came to the appellant's home and demanded that the appellant's step-daughter give him the appellant's step-granddaughter or he would take her. Copeland then parked outside the appellant's home, apparently waiting to carry out his threat. This very real threat to the appellant's loved ones provides ample motive. We find that this evidence presented at trial is sufficient to allow the jury to rule out every reasonable hypothesis except that the appellant killed Copeland with malice aforethought.

 Appellant next argues that the trial court acted with impermissible partiality toward the State when it admonished Darlene Munyon, a witness of both the defense and the State, to respond truthfully. All of the trial court's comments to this witness to which Appellant objects were made outside the hearing of the jury. We agree with the appellant when he argues that the Oklahoma Constitution guarantees every person charged with a crime a trial in which the trial judge does not entertain a

personal prejudice against him or her. Okl. Const. art. II, § 6; *see T.R.M. v. State*, 596 P.2d 902 (Okl.Cr.1979). However, the trial judge has the right to ask any witness questions which will tend to elicit the truth as long as the judge does not communicate his or her view of the issues to the jury. *See Tilford v. State*, 437 P.2d 261 (Okl.Cr. 1968). The trial judge also has the duty to see that justice is served and that both sides have a fair trial. *Id.*

Prior to being admonished by the judge outside the hearing of the jury, Debra Munyon testified as follows:

Q. Do you recall yesterday we were— Well, let me rephrase the question. Have you ever had occasion to speak with Red Arnold concerning the whereabouts of Henry Copeland?

A. Yeah, I guess I have.

Q. And when was that?

A. I don't remember.

. . . . .

Q. Where did this conversation take place?

A. Wherever we were at.

THE COURT: Ma'am you're going to need to answer the question with an answer that has some meaning to it. So if you will try to recall as where the conversation took place rather than wherever you might have been, please.

. . . . .

Q. Well, did he ever say where Henry's body was?

A. No.

(The prosecutor then began impeachment with the preliminary hearing transcript, to which defense counsel objected. During a bench conference outside the hearing of the jury the Court continued.)

THE COURT: ... What I am going to do is I'm going to excuse the jury for a minute and I'm going to have a visit with this lady, because I cannot understand—She didn't know whether he did it, and here it is on Page 23 there's a specific statement what he did with the body. I'm getting a little bit concerned about the easy lack of memory of these witnesses of things that I cannot imagine them having forgotten. (after the jury was excused the trial judge continued).

Ma'am, it is somewhat inconceivable to me that you would have given the testimony this morning that Mr. Arnold never told you, or it's alleged that you're saying that he never told you what he did with the body when I refer to Page 23 of your preliminary hearing transcript where you gave testimony under oath of the question at Line 4: "Did he ever say what happened with Mr. Copeland's body?" "Answer: He said that he buried it."

I have a hard time understanding how you could have given that testimony on April the 14th, and then today you give the testimony that he never gave you any indication of that ... I think you need to understand at this point that you're under oath under penalty of perjury ... (Tr.427–433).

We find nothing in this exchange which indicates prejudice on the part of the trial judge who exercised his sound discretion by admonishing the witness in regard to her oath outside the presence of the jury.

■ Appellant next complains of three alleged incidents of prosecutorial misconduct. First the prosecutor elicited rebuttal testimony regarding an incident in which Appellant allegedly shot a dog. After the trial court sustained the defense objection and admonished the jury to disregard this testimony, the state broached the subject again with a subsequent witness. The trial court *sua sponte* called the prosecutor to the bench and admonished him. Defense counsel moved for a mistrial at this point, but did not ask that the jury be admonished to disregard the question.

We agree with the appellant that the prosecutor's attempt to introduce this evidence after the trial court ruled it inadmissible is flagrant misconduct. However, the trial court properly restrained the scope of the prosecutor's questions and therefore appellant was not harmed. *See Black v. State*, 664 P.2d 1054 (Okl.Cr.1983).

■ Appellant next asserts the prosecutor went outside the record by arguing appellant had a motive for robbery since Copeland had possessed large amounts of money and cocaine. Appellant did not object to this statement at trial, and has thus waived all but fundamental error. *See Charbonnier v. State,* 751 P.2d 1098 (Okl. Cr.1988). While the state argues generally that counsel has a right to fully discuss the evidence, it does not squarely address appellant's allegations. Appellant objects to the following statement:

> She tells you about cocaine. She says Henry had cocaine when he returned. But when she recalled, she says, "Oh, I'm sorry, that was much earlier." Why? Cocaine and money, it's a motive. (Tr. 562).
>
> He says there's no motive. How about this alleged cocaine and the quote "lot of money" unquote, if you recall? Well, it seems to me that would make a substantial motive. Of course, they also tell you when they realized that, hey, that—we might have just given them a motive. Oh no, agent Thurman never asked us about that. That's why we never told you. They were telling everything they could. (Tr. 576–77).

We find that the prosecutor did not go outside the record, as appellant alleges. Rather he argued his own interpretation of the evidence. This argument falls within fair comment. *See e.g. Hartsfield v. State,* 722 P.2d 717 (Okl.Cr.1986).

■ Appellant alleges as his next proposition of error that the defense was compromised by the State's failure to disclose the names of two witness and provide the defense with the tape recording of the appellant's conversation with his ex-wife in which he admits he murdered Copeland. The trial judge swiftly and appropriately admonished the prosecutor. The judge then ordered the prosecutor to provide a summary to the defense of the testimony of each of these witnesses and limited the prosecutor to the scope of the summary. The prosecutor persisted in disobeying the court when he questioned Copeland's sister beyond the scope of the summary and asked her whether she had tried to locate

her brother. The defense objected, and the trial court sustained the objection. When the trial court sustains an objection most error will be cured. *See Black v. State,* 664 P.2d 1054 (Okl.Cr.1983). We do not find that the question so infected the trial that it affected the jury's verdict.

■ The prosecutor also failed to provide defense counsel with a transcript of the tape recording of Appellant's conversation before trial despite a court order to do so. Appellant argues that because of the number of places in which the transcript states only that words are "inaudible", the inability of the defense to hear the actual tape could well have had an adverse effect on the ability of the defense counsel to prepare for trial.

As we explained in *Harrall v. State,* 674 P.2d 581 (Okl.Cr.1984), error alone does not require the reversal of judgments. Rather, it is the injury caused by the error which may lead this Court to reverse, and the burden is on the appellant to establish the fact that his substantial rights to a fair trial were prejudiced by the commission of the error. *Id.* at 583. Mere speculation by the appellant that an error "could well have had an adverse effect" on the defense is not sufficient to meet this burden. The appellant must show that he was harmed. Absent a showing of harm, we do not find that the Appellant is entitled to reversal for the prosecutor's failure to conform to the order of the trial court. We trust the trial court will impose appropriate sanctions in incidents such as this.

■ Appellant next argues his conviction must be reversed because he was not arraigned within thirty (30) days of the date he was ordered held for trial in violation of 22 O.S.1981, § 470. He argues no good cause was shown for the delay. The record contradicts this contention. The court's minute order states that the arraignment was delayed when defense counsel was not present. This delay, caused by the defense cannot be used to support reversal based on the grounds of delay. *Maxey v. State,* 526 P.2d 951 (Okl.Cr.1974). Section 470 allows the trial court to post-

pone the date of an arraignment beyond the thirty (30) days set by statute for good cause. Failure of defense counsel to appear is good cause to reset the arraignment.

■ As his final proposition of error Appellant argues that the trial court committed reversible error by denying his motion to suppress and admitting State's exhibit 10, the warrantless recording of Appellant's incriminating conversation taken in Betty Arnold's living room. Appellant relies on *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Jones v. State*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 and *Rios v. United States*, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960) to argue he had the expectation of privacy in Arnold's living room and therefore, the recording violates the Fourth Amendment. He develops his argument by arguing alternatively that the recording does not satisfy the consensual exception to unconstitutional search and seizure for the Oklahoma State Bureau of Investigation (OSBI) coerced Arnold's consent to the bug, and that consensual electronic surveillance is unconstitutional. The State agrees that Arnold was coerced, and argues only that because appellant has not shown a possessory interest in the property in which his conversation was intercepted, he lacks standing to object.

■ Each of these arguments misses the mark. An individual has no constitutionally legitimate expectation that the person to whom he speaks will not relate the conversation to legal authorities either by repetition or by recording of the conversation. *United States v. CaCeres*, 440 U.S. 741, 750–51, 99 S.Ct. 1465, 1170–71, 59 L.Ed.2d 733 (1979); *United States v. White*, 401 U.S. 745, 749–51, 91 S.Ct. 1122, 1124–25, 28 L.Ed.2d 453 (1971). The Court explained its analysis in *White:*

> If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from trans-

missions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks. Nor should we be too ready to erect constitutional barriers to relevant and probative evidence which is also accurate and reliable. An electronic recording will many times produce a more reliable rendition of what a defendant has said than will the unaided memory of a police agent. It may also be that with the recording in existence it is less likely that the informant will change his mind, less chance that threat or injury will suppress unfavorable evidence and less chance that cross-examination will confound the testimony. Considerations like these obviously do not favor the defendant, but we are not prepared to hold that a defendant who has no constitutional right to exclude the informer's unaided testimony nevertheless has a Fourth Amendment privilege against a more accurate version of the events in question.

401 U.S. at 751, 91 S.Ct. at 1122, 28 L.Ed.2d 453.

■ When the appellant made incriminating statements to Arnold, he was not relying on the security of her living room. Rather, he was relying on a mistaken belief that she would not reveal his statements. *See Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). This doctrine has been developed in cases which do not raise the dispositive issue here, whether the same result is reached if the consent to "bug" is coerced. Though ignored by each of the parties, State law controls the question whether the tape is admissible. *See* Oklahoma Security of Communications Act, 13 O.S.Supp.1983, § 176.1 *et seq.* The Act provides that if one of the parties to an intercepted conversation has not given consent, the interception is prohibited and the information thus obtained is inadmissible in any judicial proceeding. *See* 13 O.S.Supp. 1982, §§ 176.4, 176.6.

The record is somewhat contradictory on the issue of consent, and not as fully devel-

oped as it might be. Arnold herself stated at trial that she was not coerced. (Tr. 463–464). Officer Cary Thurman of the Oklahoma State Bureau of Investigation gave the following account of his conversation with Arnold prior to her agreement to the electronic surveillance during cross-examination by defense counsel.

Q. Did you ever talk to them (Betty Arnold and her daughter Debbie Munyon) about the possibility of charges being filed against them in this case?

A. I did talk with them about their possible involvement in the investigation and in the crime, and it was discussed and questions were asked by them if they had reason for an attorney, and I told them that was entirely up to them. That was a decision to make with them, and as far as any charges being brought against them at that particular point in time, I did not know that I would have to continue with the investigation to discuss it with the District Attorney. (Tr. 493).

Although the State agrees in its brief that Arnold was coerced into allowing the "bug" in her living room, we do not find this position supported in the record. Arnold originally went to the police entirely of her own volition. She herself did not believe she was coerced. Details of the substance of Thurman's conversation with Arnold in which she agreed to the arrangement to install the "bug" in her living room are not within the record before us. Coercion is pressure exerted on someone which deprives the person of a free and rational choice. *United States v. Skipworth*, 697 F.2d 281, 283 (10th Cir.1983). Certainly the specter of coercion is raised by the fact that Arnold was sufficiently concerned about her involvement in the murder that she asked Thurman whether she needed to retain an attorney. However, there is nothing in the record to suggest any threat, or condition was proposed to Arnold which could be construed to deprive her of a free and rational choice.

 Standing to object to the introduction of this tape is granted by the Security of Communications Act. 13 O.S.Supp.1982,

§ 176.13. Although the appellant objected only on federal constitutional grounds, we find that compliance with the Act is a fundamental question of the proper use of police power which is appropriate to be raised *sua sponte*. We note in passing that the appellant does not direct us to any cases which support his argument that consensual electronic surveillance is unconstitutional. His argument, based on the federal constitution, has been soundly refuted by the United States Supreme Court. *See Lopez, Hoffa* and *White, supra*. We find that the trial court properly denied the appellant's motion to suppress. Finding no error which requires reversal or modification, we AFFIRM the judgment and sentence of the trial court.

PARKS, P.J., and JOHNSON and BRETT, JJ., concur.

LUMPKIN, J., specially concurs.

LUMPKIN, Judge, specially concurring:

I concur in the Court's decision in this matter and write to commend the trial judge on the professional manner in which the proceedings were conducted. His actions during the course of the trial ensured protection of the rights of witnesses as well as the defendant, and provided an impartial forum in which the trier of fact could reach a proper verdict based on the law and facts.