**Robert Leroy BRYAN, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–95–84.**

Court of Criminal Appeals of Oklahoma.

March 4, 1997.

As Corrected March 24, 1997.

Rehearing Denied April 10, 1997.

Jack L. Freeman, Edmond, for Defendant at trial.

Jan Warren, David Cummins, Assistant District Attorneys, Sayre, for State at trial.

William H. Luker, Deputy Division Chief, Capital Direct Appeals Division, Oklahoma Indigent Defense System, Norman, for Appellant on Appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, William L. Humes, Assistant Attorney General, Oklahoma City, for Appellee on Appeal.

### OPINION

CHAPEL, Presiding Judge:

Robert Leroy Bryan was tried by a jury and convicted of Murder in the First Degree in violation of 21 O.S.1991, § 701.7(A), in the District Court of Beckham County, Case No. CF–93–61. The jury found that Bryan (1) was previously convicted of a felony involving the use or threat of violence, and (2) probably would commit criminal acts of violence that would constitute a continuing threat to society. In accordance with the jury's recommendation, the Honorable Charles L. Goodwin sentenced Bryan to death. Bryan has perfected his appeal of this conviction and raises nineteen propositions of error.

Bryan was convicted of killing his elderly aunt, Inabel Bryan. At the time of the crime, Bryan was in his fifties, suffered from severe diabetes, and lived with his parents at their family farm in Beckham County. Around September 6, 1993, Bryan arranged to rent a Lincoln Town Car. Bryan specifically requested a car with a large trunk. He rented the car on September 8. Around 2:30 p.m. on Saturday, September 11, Bryan bought a distinctive lavender chrysanthemum plant at the Elk City Homeland grocery store. That evening a bystander helped Bryan change a tire on the Lincoln and saw a .22 rifle in the trunk. When Bryan returned the Lincoln on September 13, it had a .22 bullet near the driver's seat and grass and weeds stuck in the undercarriage. Bryan could not pay for the car on the 13th, but showed the dealership manager a check for $1680 made out to him by his aunt Inabel. He paid for the car the following day. Bryan and his family agreed that they seldom spoke to Inabel, had not seen her since July 17, 1993, and did not have business dealings with her.

According to the last entry in her diary, on September 11 Inabel woke at her house near Sweetwater in Roger Mills County, did chores, visited with friends, fixed and ate her lunch, studied her Sunday School lesson, picked up the mail, and took a nap. Her daughter, Linda Daley, became alarmed when she could not reach Inabel by telephone on either September 12 or 13. At the children's request Inabel's neighbor, Don Walker, went to her house twice in the late evening of September 13. Walker found that two throw rugs were disturbed, the living room curtains were open, the bed was unmade and Inabel was not there. He and his wife looked around the outbuildings, in closets and under beds. The next morning Walker returned and found Inabel's suitcase and a small overnight case containing medicines. Inabel's children, neighbors and law enforcement officials began the first of several searches of the area. Inabel's open diary was found near her reading chair, along with her open Bible and church attendance card filled out for Sunday, September 12. Daley noticed a fresh lavender chrysanthemum plant with no card on a table near the front door.

On September 16, Oklahoma State Bureau of Investigation (OSBI) and FBI agents searched a section of land adjoining the Bryan family farm. Inabel's body was found lying next to a combine in a stand of trees approximately a quarter mile from the Bryan house. Her head was covered with a stained pillowcase, and duct tape was loosely wrapped around her neck. A towel lay across one leg. She had been shot once in the forehead. Subsequent searches of the site revealed more duct tape, what appeared to be a tape-and-cloth gag, a Homeland floral receipt dated September 11, and a large mushroom with a tire track imprint. During the search agents talked to Bryan, his mother and father; after the body was found the family consented to a search of their house

and outbuildings. The house and field were searched again on September 17. Items found in the house included a .22 rifle with several boxes of shells, several expended shells, a pair of Bryan's overalls with a spent .22 shell casing in the pocket, a roll of duct tape matching tape found at the crime scene, and several blank checks. Also found were checks bearing Inabel's signature made out to Bryan on her account, and many handwritten documents detailing business agreements between Inabel and Bryan in which Inabel agreed to pay Bryan or assign him property.

## COMPETENCY TO STAND TRIAL

■ In Proposition VIII Bryan claims that forcing him to prove his incompetence to stand trial by clear and convincing evidence at his competency trial violated his right to due process of law and a reliable sentencing proceeding. Bryan pleaded not guilty at his December 15, 1993, arraignment. His retained attorney raised a doubt as to Bryan's competency based on Bryan's physical deterioration due to advanced diabetes, and because he had been determined incompetent in a previous case. The trial court ordered a competency evaluation. Bryan declined to accept the psychologist's report finding him

competent, and a jury trial on the issue of competency was held on December 30, 1993, before the Honorable Doug Haught. The jury found Bryan competent to stand trial.

Under the statute in effect at the time, Bryan was required to prove his incompetence to stand trial by clear and convincing evidence.[1] In *Cooper v. Oklahoma*[2] the United States Supreme Court held this standard violates a defendant's right to due process, and that the proper standard is a preponderance of the evidence. Pursuant to *Cooper* this court remanded the case to the District Court of Beckham County to determine whether it was feasible to conduct a retrospective hearing on Bryan's competency to stand trial at the time of trial using the correct standard, and if so, to hold the hearing.[3] On July 24, 1996, the Honorable Charles L. Goodwin determined that such a hearing was feasible, and on August 27 and 28, the Honorable Floyd D. Haught conducted a retrospective post-competency examination jury trial. The jury found by a preponderance of the evidence that Bryan was not incompetent to stand trial in January, 1995. Bryan's due process rights were not violated by these competency proceedings, and this proposition is denied.[4]

---

1. 22 O.S.1991, § 1175.4(B).

2. —— U.S. ——, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996).

3. *Bryan v. State*, Order, No. F–95–84 (Okl.Cr. June 19, 1996).

4. The Supreme Court remanded *Cooper* for proceedings not inconsistent with the opinion, but left determination of the proper remedy to this Court. *Cooper* creates a third broad class of competency-related issues. The first class is that in which an actual substantive claim of incompetency is raised on appeal or post-conviction—one in which an appellant alleges, often for the first time, that he was actually incompetent to stand trial. The second class is that in which an appellant claims he has not received a post-competency examination evaluation or other required competency hearing after raising the issue at the trial level. These cases are often called *Pate* claims. In *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), the Supreme Court held that Robinson was deprived of due process when he was denied a hearing on the issue of his competence to stand trial. The Court declined to remand the matter for a post-trial competency hearing, emphasizing the difficulty of retrospectively determining competency, and

held the six-year gap in time would aggravate the difficulties and undermine the need for concurrent determination of competency. The Court did not, however, rule that retrospective hearings may not be held where such hearings are feasible, and has never so held despite the opportunity in subsequent cases. When addressing *Pate* claims, this Court has remanded the issue for a determination of feasibility and a hearing. *See, e.g., Tate v. State*, 896 P.2d 1182 (Okl.Cr.1995) (feasibility hearing held almost five years after trial; jury trial on competency held six years after trial); *Clayton v. State*, 840 P.2d 18 (Okl.Cr. 1992) (feasibility hearing and jury trial on competency held six years after trial); *Thomas v. State*, 777 P.2d 399 (Okl.Cr.1989) (district court found retrospective hearing not feasible, case reversed and remanded for new trial); *Boltz v. State*, 806 P.2d 1117 (Okl.Cr.1991) (three and a half years between retrospective hearing and trial). Several federal jurisdictions follow this procedure. *Moran v. Godinez*, 40 F.3d 1567, *as corr. by* 57 F.3d 690 (9th Cir.1994); *Rhode v. Olk-Long*, 77 F.3d 1113 (8th Cir.1996); *U.S. v. Teague*, 956 F.2d 1427 (7th Cir.1992); *Cremeans v. Chapleau*, 62 F.3d 167 (6th Cir.1995); *U.S. v. Mason*, 52 F.3d 1286 (4th Cir.1995); *compare U.S. v. Nichols*, 56 F.3d 403 (2nd Cir.1995) (suggesting without holding that retrospective com-

■ In Proposition VII Bryan claims the trial court abused its discretion by refusing to order a second competency evaluation after being presented evidence from defense counsel and a psychiatrist that Bryan was incompetent to stand trial. This proposition is moot, as Bryan has received a full retrospective competency hearing, in which he had the opportunity to present the evidence he claims the trial court erred in failing to hear in previous proceedings.[5]

■ Bryan submitted a brief containing six supplemental propositions based on his retrospective competency proceedings. The State did not respond to these arguments. Supplemental Proposition I is addressed in the discussion of Proposition VII, *infra*. In Supplemental Proposition II Bryan claims the jury's retrospective finding that he was competent to stand trial on January 10, 1995, was not supported by competent evidence. The jury's verdict must be supported by evidence showing that it was more likely than not Bryan was not incompetent.[6] Bryan's witnesses agreed that he is an intelligent man who understood the nature and consequences of the proceedings against him. Bryan presented several witnesses including a nuclear specialist who testified about or-

ganic brain damage. Two psychiatric experts concluded that, due to his delusions, Bryan probably could not have effectively and rationally assisted counsel in his defense at his January, 1995 trial. Bryan's witnesses testified that he appeared rational unless questioned about Beckham Farm One, the subject of his delusions. Bryan argued that his delusions tied to his understanding of the crime, and led him to believe in persons and meetings that did not exist. He claimed this belief prevented him from assisting in his defense, as he continually directed his attorneys to discover nonexistent evidence. The State's medical witnesses believed Bryan was competent based on examinations conducted in December, 1993, and throughout early 1994. The State also presented lay witnesses who testified that Bryan appeared competent and non-delusional while incarcerated before trial. The State introduced letters Bryan wrote before trial to show he was aware of his physical condition (See Supplemental Proposition V), and documents Bryan wrote immediately after his jury trial, to show he understood the nature of the proceedings. These materials confirm Bryan's witnesses' descriptions of his delusions. However, as the State argued at the competency trial, the jury could have believed that Bryan's delu-

---

petency hearings are impermissible under *Pate*). Some other jurisdictions follow this procedure for *Pate* claims, while merely remanding for new trial when the claims are of actual substantive incompetence. *See, e.g., James v. Singletary*, 957 F.2d 1562 (11th Cir.1992); *Lokos v. Capps*, 625 F.2d 1258 (5th Cir.1980). *Cooper* claims such as Bryan's will occur when an appellant alleges he was found competent to stand trial under the incorrect "clear and convincing" standard. This claim hinges on the propriety of a proceeding after the competency issue has been raised at the trial level. As such, it is more analogous to *Pate* claims, which also turn on trial-level proceedings after the issue is raised, than it is to claims of actual substantive incompetence, which may not have been raised at trial and do not involve allegations that proper procedures were not followed. In both *Cooper* and *Pate* claims, if the proper procedure or evidentiary standard were followed, the competency determination below would be valid and would not affect the subsequent trial and verdict. For this reason we adopt the *Pate* remedy for *Cooper* claims. Where a defendant had a jury trial on the issue of competency using the incorrect standard, we will remand. If a district court determines that it is feasible to hold a retrospective competency pro-

ceeding using the "preponderance of the evidence" standard, that hearing should be held and made a part of the record before this Court. The remainder of the direct appeal can then be decided. If the district court determines it is not feasible to hold such a hearing, then this Court must reverse and remand for a new trial.

5. In Supplemental Proposition I Bryan claims that evidence adduced at the retrospective competency trial supports his Proposition VII contention that the trial court erred in refusing a second evaluation. As we find that the proposition is moot, we do not address these claims. The statutes regarding an application for determination of competency provide that an application may be brought at any time and that a defendant need merely raise a doubt in his application. 22 O.S.1991, § 1175.2. Counsel's evidence alone may establish such a doubt. A defendant may continue to raise the issue of competency at any time during criminal proceedings, even if he has been found competent by a court or jury trial. A defendant need only raise a doubt as to his competency in any subsequent application.

6. *Cooper*, —— U.S. at ——–——, 116 S.Ct. at 1384–84.

sions were merely lies designed to protect him from responsibility for his aunt's death. Overwhelming evidence showed Bryan understood the nature and consequences of the proceedings and at least attempted to assist counsel in his defense. Any rational trier of fact could have found, from the evidence presented, that Bryan was competent to stand trial on January 10, 1995. This proposition is denied.

■ In Supplemental Proposition III Bryan argues the competency trial court erred in failing to instruct the jury not to consider his guilt or innocence of, or conviction for, the crime charged. Bryan's requested Instruction 4 would have prohibited the jury from considering (1) Bryan's guilt or innocence of the crime charged, and (2) the reasons for the retrospective competency proceedings. The trial court refused Instruction 4 because some facts involving the charged offense had been admitted to support the State's contention that Bryan's delusions were an attempt to formulate an alibi. These facts were properly before the jury, and the court did not want to create confusion about what evidence the jury could consider. Bryan's requested Instruction 6 would have prohibited the jury from considering Bryan's conviction for the charged offense. The trial court refused this instruction because the jury was instructed not to consider what effect, if any, the competency hearing would have on Bryan's prior conviction. Bryan argues that the failure to give requested Instructions 4 and 6 allowed the jury to consider his guilt of the crime charged and use his prior conviction as evidence of competency, and required him to prove not only incompetence but innocence. We disagree. The trial court gave the appropriate instructions prescribed by the Oklahoma Uniform Jury Instructions—Criminal (2nd) (OUJI). These clearly told the jury to consider only whether Bryan was competent to stand trial on January 10, 1995. The trial court also explicitly instructed the jury not to consider the effect their decision might have on Bryan's previous conviction. The instructions did not allow the jury to consider Bryan's guilt or innocence, or to use Bryan's conviction as evidence of competence. This proposition is denied.

■ During deliberations, the jury asked whether Bryan would get another trial if he were found incompetent, or whether, if competent, he would be sent back to death row. In Supplemental Proposition IV Bryan claims the trial court erred in refusing to answer this question. Bryan had previously requested Instruction 5, which would have informed the jury that a finding of incompetency would delay prosecution until Bryan was determined to be competent, at which time he would be retried. The trial court refused to give that instruction because it was not found in the OUJI competency instructions. Bryan renewed his request after receipt of the jury's question but the trial court again declined to instruct the jury. Over Bryan's objection the court replied that the jury had all the law it needed to decide the issue before it. Bryan claims that this instruction allowed the jury to suffer from a misunderstanding which created a false choice. His reliance on *Simmons v. South Carolina*[7] is inapposite. There, a jury questioned when a capital defendant would be eligible for parole, and returned a verdict of death after the trial court refused to answer. In fact, the defendant was not eligible for parole. The Supreme Court held this created a false choice for the jury, which may have sentenced the defendant to death in order to avoid a wholly fictitious possibility of parole. No analogous false choice exists here: the jury's question did not betray any fundamental misunderstanding of the possible consequences of their decision. This Court has held that an instruction on a defendant's disposition after a finding of incompetency is not required.[8] Bryan's jury had been instructed not to consider any effect these proceedings may have had on his conviction, and the trial court did not err in refusing to instruct on the potential effects of the jury's decision. This proposition is denied.

---

**7.** 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).

**8.** *Lambert v. State*, 888 P.2d 494, 503 (Okl.Cr. 1994).

In Supplemental Proposition V Bryan claims the trial court erred in allowing the State to introduce documents into evidence in violation of the Discovery Code. Over Bryan's objection, the State introduced several letters he wrote to jail and court officials while incarcerated before trial. The State did not give notice of intent to use either the letters or testimony concerning them. The trial court mistakenly agreed that this did not violate the trial court's discovery order requiring such notice because Bryan's trial attorneys gave the materials to the State. In addition to summaries of a witness's expected testimony, the Oklahoma Discovery Code requires pretrial disclosure of any documents which the State intends to use at trial or which were obtained from the defendant.[9] The State should not have relied on Bryan's knowledge that these documents existed; the question was whether Bryan was able to prepare to meet those documents at trial, and he was not.[10] We do not suggest that the State must recopy and return to a defendant documents which it originally received from him, but the State is required to give the opposing party notice that it intends to use a particular document which the party had earlier provided. However, this error is subject to harmless error analysis. Bryan's incompetency claim went specifically to the effect his delusions had on his ability to assist his attorneys; he did not contest evidence that, otherwise, he was intelligent and understood the proceedings. The documents reflect Bryan's concern about his lack of appropriate diet and medical treatment while awaiting trial, and were introduced to show he was aware of his medical condition. The letters neither confirmed nor refuted Bryan's claim that his delusional state rendered him unable to assist in his defense, and the jury could have disregarded them when reaching the verdict of competency. This proposition is denied.

In Supplemental Proposition VI Bryan challenges the retrospective compe-

tency proceedings. He first claims that this Court has no authority under Oklahoma's statutes governing competency proceedings to remand *Cooper* claims for retrospective competency determinations. Bryan argues he has a due process liberty interest in having his competency determined before he stands trial. On the contrary, Bryan's interest under the competency statutes is in being found competent to participate in criminal proceedings, defined as "every stage of a criminal prosecution after arrest and before judgment, including, but not limited to, interrogation, lineup, preliminary hearing, motion dockets, discovery, pretrial hearings and trial".[11] The statute requires only a determination that Bryan was competent to participate in criminal proceedings before his conviction, and does not prohibit this Court from remanding a case for a lower court to make the determination. The retrospective competency proceedings did not violate Bryan's due process liberty interests.

Bryan also claims that the retrospective proceedings violated his right to a presumption of innocence. He explicitly assumes that his retrospective competency jury presumed his guilt of the crime charged when determining his competency to stand trial. We reject this assumption. The competency jury does not consider issues of guilt or innocence. Bryan's jury decided the sole issue of competency to stand trial at a particular time, just as it would have had the proceedings been held *before* Bryan's conviction. The retrospective competency proceedings did not violate Bryan's presumption of innocence. As Bryan's due process rights, liberty interest, and presumption of innocence rights were not violated, these proceedings did not render Bryan's death sentence unreliable. Bryan argues that Oklahoma's statutory definition of competency is constitutionally inadequate. We have previously rejected this argument, and will not reconsider it.[12]

---

9. 22 O.S.Supp.1994, §§ 2002(A)(1)(a), (e).

10. *Cf. Jackson v. State*, 811 P.2d 614, 616 (Okl. Cr.1991) (error where the State never endorsed a key witness known to capital defendant; question was not whether defendant knew of witness

but whether defendant was prepared to defend against witness's testimony).

11. 22 O.S.1991, § 1175.1(3).

12. *Lambert*, 888 P.2d at 498–99.

■ Finally, Bryan claims that the State failed to meet its initial burden of proving it was feasible to hold retrospective competency proceedings in this case. At the feasibility hearing the State presented the expert who had examined Bryan in December, 1993, and testified at the 1994 competency trial. That expert confirmed that he remembered the case, had his notes, and could render an opinion as to Bryan's competency at the time of the examination in retrospective proceedings. Bryan correctly argues that the expert had no opinion as to Bryan's competency in January, 1995, but the expert's opinion went to the weight of his testimony at the competency trial, not to the feasibility of holding further proceedings. The expert testimony was presented at the original competency trial, and its repetition put Bryan in a position comparable to the one he would have been in before being tried for the crime charged.[13] The retrospective competency proceedings violated neither the United States nor Oklahoma Constitutions, and this proposition is denied.

## PRETRIAL ISSUES

■ In Propositions II, III, and IV Bryan raises issues based on the September 16 and 17, 1993, searches of his home. In Proposition II Bryan claims the trial court erred when it allowed the prosecution to introduce his September 16, 1993, statements to police. Bryan argues that at the time of these statements the police restricted his freedom of movement, and he was neither advised of nor waived his constitutional rights. This proposition turns on Bryan's vigorous but mistaken argument that he was functionally in custody when he spoke with police on September 16. Bryan objected to testimony about his September 16 state-ments and has preserved this issue for appellate review. *Miranda*[14] warnings need not be given unless a person is in custody or otherwise significantly deprived of freedom of action.[15] Before warnings are required, a person's freedom of movement must be restrained to the degree of formal arrest.[16]

Contrary to Bryan's assertions, a review of the totality of the circumstances does not show his movement was significantly restricted on September 16. Officers arrived at the house about 5:00 p.m., identified themselves, and said they were speaking to people about Inabel Bryan's disappearance. Bryan invited them in, told them when he saw the victim last, and talked about their family relationship. Bryan admitted at trial that, despite the lack of warnings, he was familiar with his *Miranda* rights and was careful what he said to the officers. After the body was found, investigating agents left one officer to watch the house. Bryan argues this officer would not let them leave the property. Evidence showed the officer had not been ordered to stop the family from leaving; he merely asked them not to drive towards the crime scene, and did not attempt to otherwise restrict their movement.[17] Bryan argues that the subsequent consent search of the house and curtilage shows restriction of movement, since the family was not allowed to enter the house during that search. The family's agreement to stay outside during that search does not show Bryan's other movements were restricted. The record does not support Bryan's argument that the officers knew *Miranda* applied and that they should have warned Bryan of his rights. Bryan was not in custody and his freedom of movement was not significantly restricted. This proposition is denied.

**13.** *Tate v. State*, 896 P.2d 1182, 1187–88 (Okl.Cr. 1995).

**14.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**15.** *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612; *California v. Beheler*, 463 U.S. 1121, 1123, 103 S.Ct. 3517, 3519, 77 L.Ed.2d 1275 (1983); *Crawford v. State*, 840 P.2d 627, 635 (Okl.Cr. 1992).

**16.** *Stansbury v. California*, 511 U.S. 318, 322–23, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994); *Crawford*, 840 P.2d at 635; *Moore v. State*, 761 P.2d 866, 876 (Okl.Cr.1988); *Glenn v. State*, 749 P.2d 121, 125 (Okl.Cr.1988); *Casey v. State*, 732 P.2d 885, 887 (Okl.Cr.1987).

**17.** Bryan relies on testimony from the first trial. This testimony was neither recognized by the trial court nor used for impeachment and is not before this Court.

In Proposition III Bryan claims that the introduction of evidence obtained pursuant to the September 16 consent search of his residence violated his rights because these items were seized without a search warrant or a valid consent to search. After the victim's body was found, Bryan and his father gave agents oral consent to search. Before searching, Bryan showed Agent Damron the property and identified the outbuildings, and Damron copied this list on three separate consent to search forms. Bryan, his father, and his mother each executed a consent form, and the search began around 7:20 p.m. The trial court held a *Jackson v. Denno*[18] hearing on Bryan's objection that the search was illegal, and specifically found that all three consents were valid. This Court will not reverse a trial court's determination of voluntariness where competent evidence reasonably tends to support the trial court's findings.[19] Voluntariness is determined from the totality of the circumstances and must not exceed the scope of consent.[20] The presumption against voluntary waiver does not apply in consent search cases.[21] The State must prove voluntariness by clear and positive evidence that consent was unequivocal, specific, and truly and intelligently given.[22]

Evidence supports the trial court's finding that consent was voluntary, and does not support Bryan's claim that a comprehensive search of the house and grounds began before officers asked the family for consent. The only search conducted before the consent forms were signed was the search of the field in which the body was found, and Bryan does not question the legality of that search. Between the search for the body and the consent search of the house and property, an officer entered the house to get chairs for the family. Bryan and his mother testified that officers were in and out of the house, and Bryan's father's testimony from the first trial, admitted into evidence, corroborated that account. Bryan and his mother and father each admitted knowing what they signed but maintained that officers searched before they signed anything. Later in the trial, Bryan's mother denied signing anything on September 16, despite her earlier testimony identifying and acknowledging the consent form. The trial court had an opportunity to weigh the family evidence against that of the officer who obtained the consent forms. This Court will not reverse where competent evidence supports the trial court's findings.[23] The overwhelming weight of competent evidence indicates that no search had begun before the consent forms were executed. Each family member testified at some point that they understood the consent forms and knew what they were signing, and Bryan and his father assisted Damron in preparing the forms. This was not a case where the family simply acquiesced to inevitable police authority. The trial court did not err in finding voluntary consent to search; this proposition is denied.[24]

In Proposition IV, Bryan claims the trial court erred when it admitted into evidence the items police took from his bedroom on September 17, 1993. He first contends that the search warrant authorizing the September 17 search of his residence was the fruit of his September 16 statements, taken in violation of his constitutional rights and of the illegal search of his room on September 16. The claim depends wholly on the success of Propositions II and III. As Bryan's statements were not obtained in violation of his

**18.** *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) established a defendant's right to an in camera hearing on the voluntariness of his confession.

**19.** *McGregor v. State*, 885 P.2d 1366, 1377 n. 20 (Okl.Cr.1994); *Lyons v. State* 787 P.2d 460, 464 (Okl.Cr.1990).

**20.** *State v. Young*, 561 P.2d 993, 996 (Okl.Cr. 1977); *U.S. v. Dewitt*, 946 F.2d 1497, 1501 (10th Cir.1991); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

**21.** *U.S. v. Price*, 925 F.2d 1268, 1270 (10th Cir. 1991).

**22.** *State v. Kudron*, 816 P.2d 567, 571 (Okl.Cr. 1991).

**23.** *Lyons*, 787 P.2d at 464.

**24.** Bryan argues that the State cannot rely on third-party consent. This argument is moot since the trial court found that Bryan himself executed a voluntary consent to search.

constitutional rights, and the September 16 search was conducted pursuant to valid consent, this argument has no merit.

▮▮▮▮ Bryan next claims that the affidavit supporting the September 17 search warrant did not set forth facts showing probable cause that Inabel Bryan's promissory notes, checks, and business records were located in Bryan's residence. Bryan complains that the affidavit in support of the September 17 search warrant did not support the portion of the warrant which authorized a search for Inabel Bryan's business records or checks. A search warrant must be supported by an oath or affirmation and a particular description of the place, person, or things to be searched and seized, such that a magistrate could conclude a substantial basis exists to believe the search would uncover evidence of wrongdoing. This Court will defer to the magistrate's determination.[25] Affidavits must show a probability that contraband, items used in a crime, or the fruits of a crime are on the premises to be searched,[26] and the probable cause must be demonstrated solely by the evidence before the magistrate.[27] While a simple assertion of an officer's suspicion or belief is not sufficient to establish probable cause,[28] an agent's opinions and experience are entitled to consideration in the determination of probable cause.[29]

Evidence supported the magistrate's finding of probable cause to search. The affidavit set forth the facts of the discovery of Inabel Bryan's body, the autopsy, the circumstances surrounding the procurement, condition, and contents of the rental car, the results of the September 16 consent search, and Bryan's September 16 statements about Inabel. The affidavit also noted that her purse, check book, financial information, and keys were missing, averred that Bryan offered a $1,680.00 check from Inabel as proof of payment for the rental car, and stated that Inabel's daughter confirmed that she neither owed Bryan money nor would have written him a check for that amount. This evidence amounts to more than mere suspicion and supported the magistrate's determination of probable cause to believe Bryan's house might contain financial information about Inabel.

▮▮▮▮ Finally, Bryan claims that the warrant authorizing the seizure of this evidence became void because it was not returned within the limits set by law. This argument is completely without merit. The warrant was issued and executed on September 17, 1993, and returned on September 28, eleven days later. A warrant is void if not executed and returned within ten days.[30] A late warrant is void only if not executed, and this Court has held that return on an executed warrant may be made at any time before trial.[31] The affidavit for the September 16 warrant was sufficient, and it was properly executed and returned. The evidence obtained from the September 17 search was properly admitted into evidence, and this proposition is without merit.

In Proposition V Bryan claims that the trial court erred in admitting into evidence statements he made shortly after his arrest because evidence used to support the finding of probable cause for the arrest warrant was not legally obtained. This proposition depends on the success or failure of the preceding three arguments. The affidavit in support of the September 17 warrant for Bryan's arrest was identical to the affidavit in support of the September 17 search. Bryan's argument must fail because a) Bryan's September 16 statements did not violate his constitutional rights, b) the September 16 search was pursuant to valid con-

---

**25.** *Gregg v. State,* 844 P.2d 867, 874 (Okl.Cr. 1992); *United States v. Wicks,* 995 F.2d 964, 972 (10th Cir.1993).

**26.** *Leonard v. State,* 453 P.2d 257, 259 (Okl.Cr. 1969); *U.S. v. Neal,* 500 F.2d 305, 307 (10th Cir.1974).

**27.** *Edmondson v. U.S.,* 402 F.2d 809, 812 (10th Cir.1968).

**28.** *McCann v. State,* 504 P.2d 432, 435 (Okl.Cr. 1972).

**29.** *Wicks,* 995 F.2d at 972.

**30.** 22 O.S.1991, § 1231.

**31.** *McGee v. State,* 645 P.2d 529, 531 (Okl.Cr. 1982).

sent, and c) the September 17 arrest warrant was proper. His post-arrest telephone conversation, overheard by a booking officer, was properly admitted into evidence. This proposition is denied.

In Proposition VI Bryan argues that the trial court committed reversible error by denying his motion to dismiss for lack of venue because the State failed to present sufficient evidence that the crime occurred in Beckham County, Oklahoma. The Oklahoma Constitution provides that "where uncertainty exists as to the county in which the crime was committed, an accused may be tried in any county in which the evidence indicates the crime might have been committed." [32] Venue is not an element of a crime. It need only be proved by a preponderance of the evidence, and it may be supported by direct or circumstantial evidence.[33] Inabel Bryan lived in Roger Mills County. Her body was found in Beckham County. No direct evidence showed whether she was abducted from her home or where she was killed. At the close of the State's case Bryan demurred to the evidence and moved for a directed verdict, claiming the State had not proved venue. The trial court found venue based on the location of the body, the location of the possible murder weapon, the cause of death, the location of the .22 shells and Homeland receipt, and the map.

Inabel Bryan's body was found at the Beckham County crime scene, in addition to a bloodstained pillowcase attached to the victim with duct tape, two wads of duct tape, duct tape attached to one piece of cloth that appeared to have been used as a gag, and the Homeland floral receipt. At Bryan's Beckham County home officers found a .22 rifle, a partially empty box of .22 bullets which had a source consistent with the bullet in the vic-

tim's head, several spent .22 shells (including one in Bryan's overalls), duct tape matching tape at the crime scene, and burned and intact checks on Inabel Bryan's bank account, some of which were signed and made out to Bryan. This evidence, along with the absence of any evidence beyond the crime scene of any other venue, is sufficient to prove the murder might have taken place in Beckham County.[34] This proposition is denied.

In Proposition IX Bryan contends that the trial judge erred by not disqualifying himself from the case because of the existence of circumstances of such a nature as to cause doubts as to the judge's partiality, bias, or prejudice. After his first trial ended in a mistrial, Bryan requested that Judge Goodwin recuse himself. Judge Goodwin denied the motion after a hearing on October 19, 1994; the district's Presiding Judge upheld the decision in a subsequent hearing on November 14, 1994. Bryan claims these decisions were in error because Judge Goodwin had previously represented him, and this representation, along with Judge Goodwin's sentencing in a prior case and his actions in this case, created a doubt that Bryan had a fair and impartial trial. This claim is without merit.

The Oklahoma Constitution guarantees a defendant a right to a fair, impartial trial not tainted by the personal bias or prejudice of the trial court.[35] A defendant must show that the trial court harbored prejudice against him which materially affected his rights at trial.[36] The record must show that a defendant was prejudiced by the trial court's actions.[37] The decision to recuse is within the discretion of the trial court, and this Court will disturb that ruling only for an

---

**32.** Okla. Const. art. 2, § 20. Bryan's reliance on 22 O.S.1991, § 124, and cases interpreting that statute, is inapposite. That statute governs jurisdiction in cases where an offense is partly committed in more than one county. Venue is not the same as jurisdiction.

**33.** *Omalza v. State*, 911 P.2d 286, 294 (Okl.Cr. 1995).

**34.** *See Omalza*, 911 P.2d at 295.

**35.** Okla. Const., art 2 § 6; *Arnold v. State*, 803 P.2d 1145, 1148–49 (Okl.Cr.1990).

**36.** *Stouffer v. State*, 738 P.2d 1349, 1353 (Okl.Cr. 1987).

**37.** *Carter v. State*, 560 P.2d 994, 996–97 (Okl.Cr. 1977).

abuse of discretion.[38] This Court and the Oklahoma Supreme Court have found abuse of discretion where trial judges are intertwined in cases due to personal relationships or actions which show actual prejudice against a defendant.[39] The mere fact that a trial judge may have previously represented a defendant or presided over a prior unrelated case does not require disqualification.[40] A trial court need not recuse for attempts to expedite a case, conduct a trial with dispatch[41] or privately admonish witnesses to answer questions truthfully.[42] The trial court must perform its duty to see both sides have a fair trial and to ensure a fair and impartial hearing.[43]

Bryan cites several circumstances he believes show bias or prejudice. Bryan testified on October 19 that he consulted Judge Goodwin several times in the early 1980s regarding his business enterprises. He believed that Judge Goodwin did not like him, that Judge Goodwin thought he was responsible for the resulting litigation over the business's failure, even though he was not a party to any of those suits, and that Goodwin presided over some of those civil cases. While questioning Bryan, Judge Goodwin denied all these claims, suggesting that Bryan consulted him once in 1976 about a school employment matter and left without paying when quoted a fee. Judge Goodwin suggested Bryan was recalling conversations and representation that never occurred. Bryan repeated his testimony in the November 11 hearing. The unsupported allegations in this exchange do not create a doubt regarding Judge Goodwin's bias or impartiality.

In 1989, Bryan initially pled guilty to solicitation of murder, but Judge Goodwin's sentence did not reflect the plea bargain Bryan made with the State. Judge Goodwin allowed Bryan to withdraw his plea and recused himself from the case; Bryan went to trial, was convicted and received substantially the same sentence as the original plea bargain. Bryan's hearing testimony indicates he did not fully remember what sentence Judge Goodwin actually imposed. On appeal Bryan argues both that the sentence in the 1989 case showed bias, and that, since Judge Goodwin recused himself in that case, he should either have recused himself again or stated why recusal was proper in 1989 but was not appropriate in this trial. We disagree. Imposition of a different sentence than that agreed on by the parties does not in itself show bias. The two proceedings were completely different and Judge Goodwin's position in the 1989 case is not analogous to his position as trial court in 1994. The decisions regarding recusal are separate and not inconsistent.

Bryan alleges several other circumstances in support of this claim. He notes that State's Exhibit 66, apparently written by Bryan, accuses Judge Goodwin of taking substantial bribes to Bryan's disadvantage in suits over Bryan's businesses. While this may, as Bryan suggests, have exasperated the trial court, that conclusion is not supported by the record, and exasperation would not create a doubt as to the court's fairness or impartiality. Bryan claims pretrial proceedings show that Judge Goodwin was not cordial to him; he specifically raises the court's handling of his second application for a competency evaluation, the court's pretrial decision to incarcerate Bryan at the Granite

**38.** *Stouffer*, 738 P.2d at 1353; *T.R.M. v. State*, 596 P.2d 902, 905 (Okl.Cr.1979).

**39.** *Wilkett v. State*, 674 P.2d 573 (Okl.Cr.1984) (trial court expressed resentment of defendant, accused trial counsel of dishonest, false and dilatory action, and revealed annoying pre-trial contacts with defendant's family members); *Merritt v. Hunter*, 575 P.2d 623 (Okl.1978) (trial court traveled without subpoena at own expense to testify against opponent in pending Kansas case); *Sadberry v. Wilson*, 441 P.2d 381 (Okl.1968) (trial court must award brother attorney fees); *St. ex rel Larecy v. Sullivan*, 207 Okl. 128, 248 P.2d 239 (1952) (wife's opponent in divorce case worked for trial court political campaigns, opponent attorney was trial court advisor).

**40.** *Stouffer*, 738 P.2d at 1353; *Carter*, 560 P.2d at 996–97; *Sam v. State*, 510 P.2d 978, 981 (Okl.Cr. 1973), *overruled on other grounds, Buis v. State*, 792 P.2d 427, 431 (Okl.Cr.1990).

**41.** *Shepard v. State*, 756 P.2d 597, 600 (Okl.Cr. 1988); *Stouffer*, 738 P.2d at 1353.

**42.** *Arnold*, 803 P.2d at 1148.

**43.** *Stouffer*, 738 P.2d at 1353; *T.R.M.*, 596 P.2d at 905.

penitentiary for medical assistance, and the court's treatment of trial counsel during the second trial. Bryan also raises the circumstances of the mistrial, which occurred when Judge Goodwin (outside the jury's presence) suggested trial counsel's performance bordered on incompetence. At most, the record shows Judge Goodwin failed to understand the procedures mandated under the competency statutes, was critical of trial and pretrial counsel, and wished to expedite the trial. Any criticism of trial counsel took place outside the jury's presence. Judge Goodwin did not unduly limit counsel's cross-examination, and the exchanges accompanying those rulings did not show any bias directed at Bryan. The record shows a fair and impartial hearing and simply does not reflect any personal prejudice or bias against Bryan. This proposition is denied.

## ISSUES RELATED TO GUILT OR INNOCENCE

█ In Proposition I Bryan claims he was deprived of a fair trial and reliable sentencing proceeding by the introduction of evidence in the first stage of his trial concerning his alleged solicitation of the murder of Jimmy Dean Harrell. There is nothing "alleged" about this crime. In 1989 Bryan was convicted of solicitation of murder. He negotiated with a third party to kidnap Harrell, a local banker who appeared peripherally involved in business and land transactions with Bryan. Bryan drew a map of his parents' property showing the third party where to bring Harrell. Bryan planned to hold Harrell there, force him to sign promissory notes, kill him, and present the notes to his estate. This plan led to Bryan's conviction because the third party he approached was undercover law enforcement officer Goss.

Bryan filed pretrial motions in limine to prevent the State from using this evidence during the first stage of trial. The State never actually filed a *Burks*[44] notice, but offered the other crimes evidence as proof of identity, motive, intent, preparation and plan. The trial court reserved ruling on Bryan's motions, but prohibited the State from referring to the evidence in opening statement. During cross-examination of Officer Hay, Bryan asked why officers did not tell the family they were conducting the September 16 search of the field where the body was found, and Hay replied they did not want to alert the family in case the victim was still alive. The trial court ruled that Bryan had opened the door to testimony about the previous case, but that evidence must be specific. Over Bryan's objection, Hay testified about Bryan's prior plan to kidnap Harrell and hold him hostage in the same location. After three more witnesses testified, the trial court **sua sponte** gave a limiting instruction and told the jury to consider Hay's evidence only on the issues of opportunity and intent. Later in the trial, Bryan objected to Goss's testimony about the Harrell crime. The trial court ruled that the testimony would not be admissible to show plan, scheme or design, but would be admitted to show opportunity or intent, prohibited specific details of the crime except to show a connection with the crime charged, and gave another limiting instruction.

█ A defendant should be convicted, if at all, by evidence of the charged offense and not by evidence of similar offenses.[45] Evidence of other crimes is extremely limited and looked on with suspicion but may be admissible to show, among other things, motive or intent.[46] The uncharged offense must be probative to the crime charged, there must be a visible connection between the crimes, the evidence of other crimes must be necessary to support the State's burden of proof, proof of the evidence must be clear and convincing, and the trial court must issue contemporaneous and final limiting instructions.[47] After determining the evidence falls within a *Burks* exception, the trial court must make a finding that the probative value

---

44. *Burks v. State,* 594 P.2d 771 (Okl.Cr.1979), *overruled in part on other grounds, Jones v. State,* 772 P.2d 922 (Okl.Cr.1989).

45. *Sattayarak v. State,* 887 P.2d 1326, 1331 (Okl. Cr.1994); *Burks,* 594 P.2d at 773–75.

46. 12 O.S.1991, § 2404(B).

47. *Burks,* 594 P.2d at 774–75.

of the evidence outweighs the prejudice to the accused.[48] Other crimes evidence should not be admitted where it is so prejudicial it denies a defendant his right to be tried only for the offense charged,[49] or where its minimal relevancy suggests the possibility the evidence is being offered to show a defendant is acting in conformity with his true character.[50] Where, as here, the claim was properly preserved, the State must show on appeal that admission of this evidence did not result in a miscarriage of justice or constitute a substantial violation of a constitutional or statutory right.[51]

Bryan argues that this evidence was not probative of any issue at trial, had no visible connection with the charged crime, and was highly prejudicial. The State's response focuses entirely on the exception allowing other crimes evidence which shows a common scheme or plan, although the trial court specifically declined to admit this evidence for that purpose, and only admitted the evidence to show opportunity or intent.[52] This Court must review the evidence to determine not only similarity, but if there was a visible connection between the 1989 crime and the offense charged.[53] Similarities in both crimes were that a) Bryan believed the victim to have been associated in some way with his previous business ventures, b) Bryan intended to have the victim sign promissory notes or other financial instruments which he would subsequently present for payment, and c) Bryan planned to kidnap the victim.[54] In the 1989 crime Bryan instructed Goff to take

Harrell and hold him at family property where Inabel Bryan's body was found four years later. This list of similarities shows a visible connection sufficient to be probative on the issue of intent, and shows Bryan had the opportunity to commit the charged crime. Although no *Burks* notice was filed, Bryan clearly had notice that the State intended to use this evidence well in advance of trial. Proof of the evidence was clear and convincing, and it was not cumulative but necessary to sustain the State's burden of proof in this circumstantial evidence case. The prejudicial effect of the evidence, while significant, did not outweigh its probative value. The trial court did not err in admitting the evidence, and this proposition is denied.

In Proposition X Bryan contends the prosecutor committed reversible error by commenting on his failure to testify in the first stage of the trial, and claims the trial court's refusal to grant his motion for a mistrial constituted a denial of his constitutional rights. During first stage closing argument, the prosecutor discussed the medical examiner's testimony, noted that nobody knew where or when the victim died, and argued, "And you know who can answer those questions for us? But does it matter, does it matter? Do you have any doubt? Do you have any reasonable doubt in your mind?" The trial court admonished the prosecutor and overruled Bryan's motion for mistrial and his objection that this commented on his failure to testify.

48. *Knighton v. State*, 912 P.2d 878, 889 (Okl.Cr. 1996); *Blakely v. State*, 841 P.2d 1156, 1159 (Okl.Cr.1992); *Stowe v. State*, 590 P.2d 679, 682 (Okl.Cr.1979). *Compare Revilla v. State*, 877 P.2d 1143 (Okl.Cr.), *cert. denied*, — U.S. —, 115 S.Ct. 764, 130 L.Ed.2d 661 (1994), and *Robedeaux v. State*, 866 P.2d 417 (Okl.Cr.1993), *cert. denied*, 513 U.S. 833, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994), in which we held other crimes evidence probative to motive should be admitted without engaging in any analysis of probative value versus prejudicial effect.

49. *Sattayarak*, 887 P.2d at 1331; *Turner v. State*, 629 P.2d 1263 (Okl.Cr.1981).

50. *Blakely*, 841 P.2d at 1159.

51. 20 O.S.1991, § 3001.1; *Hammon v. State*, 898 P.2d 1287, 1302 (Okl.Cr.1995).

52. The State relies on *Roubideaux v. State*, 707 P.2d 35 (Okl.Cr.1985). This three-judge opinion has no precedential value on the issue of common scheme or plan.

53. *Blakely v. State*, 841 P.2d 1156, 1159 (Okl.Cr. 1992); *Allen v. State*, 611 P.2d 254 (Okl.Cr.1980); *Bunn v. State*, 85 Okl.Crim. 14, 184 P.2d 621, 624–25 (1947).

54. No evidence shows whether Inabel Bryan was abducted or left her home willingly. However, circumstantial evidence of abduction includes her abrupt departure, the open curtains, scattered throw rugs, an unmade bed, and the fact Bryan specifically asked for a rental car with a large trunk shortly before the victim's disappearance.

 Both parties agree that the State may not comment on a defendant's failure to testify.[55] The State argues that the comment above does not directly and unequivocally call attention to Bryan's failure to testify such that the jury would naturally and necessarily understand the statement could only be rebutted by Bryan personally. On the contrary, the comment does more than state that only the killer knew when the victim was murdered. In context, this directly points to Bryan, since the State claimed that he was the killer. Bryan's only witnesses were his mother and the local medical examiner who saw the body at the scene. The prosecutor did indeed err in commenting on Bryan's failure to testify. However, this error is subject to harmless error analysis. Bryan suggests that this error should not be harmless where the case is based wholly on circumstantial evidence, but his cited cases do not support that claim.[56] The circumstantial evidence here was unusually strong. The State did not repeat this comment and was admonished not to discuss this area, and the comment itself was followed by the question, "Does it matter?" suggesting that whether or not Bryan testified the evidence showed there could be no reasonable doubt as to his guilt. The jury could have disregarded this comment entirely when determining Bryan's guilt, and the error is harmless beyond a reasonable doubt.[57] As the error is harmless, the trial court did not abuse its discretion in refusing to grant a mistrial. This proposition is denied.

 In Proposition XI Bryan argues the State failed to prove his guilt beyond a reasonable doubt. On review, we must determine whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime charged.[58] Circumstantial evidence must exclude every reasonable hypothesis except guilt.[59] This Court will accept all reasonable inferences and credibility choices tending to support the verdict.[60]

Circumstantial evidence linking Bryan to the crime includes:

—Bryan rented a Lincoln with a large trunk shortly before the victim's disappearance; failed to return it before the victim disappeared, and returned it with grass and weeds on the undercarriage, a .22 bullet near the driver's seat, and the victim's hair on the spare wheel cover; carried a .22 rifle in the trunk; and showed as collateral for payment a check for $1680 payable to Bryan drawn on the victim's bank account; a tire track on a mushroom at the crime scene matched the Lincoln; fibers on the victim's body, clothing and duct tape at the scene were consistent with fibers from the Lincoln's trunk;

—on September 11 Bryan bought a distinctive chrysanthemum plant at the Elk City Homeland which was found in the victim's house on September 13; the receipt for that plant was found near the body;

—bullet fragments in the victim's head were most probably from a .22 bullet; a loaded .22 rifle was found in Bryan's house and a spent .22 shell was found in his

55. *Renfro v. State*, 734 P.2d 286, 289 (Okl.Cr. 1987); *Neal v. State*, 597 P.2d 334, 336–37 (Okl. Cr.1979); *Sisk v. State*, 487 P.2d 1003, 1004 (Okl.Cr.1971); *see also White v. State*, 900 P.2d 982, 992 (Okl.Cr.1995) (comments on defendant's post-arrest silence, error cured when trial court sustained objection and admonished jury).

56. In *Fontaine v. California*, 390 U.S. 593, 88 S.Ct. 1229, 20 L.Ed.2d 154 (1968), the State argued and the trial court instructed that the jury could take Fontaine's failure to testify into consideration and draw an adverse effect from his silence. The Supreme Court held that, in the absence of the informant's testimony, the evidence would not have been sufficient to convict absent this erroneous argument and instruction. In *Littlejohn v. State*, 713 P.2d 22 (Okl.Cr.1986),

this Court ruled that where the circumstantial evidence was weak, continued questioning about Littlejohn's post-arrest silence was not harmless.

57. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

58. *Spuehler v. State*, 709 P.2d 202, 203–04 (Okl. Cr.1985); *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

59. *Mayes v. State*, 887 P.2d 1288, 1301–02 (Okl. Cr.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995).

60. *Maxwell v. State*, 742 P.2d 1165, 1169 (Okl.Cr. 1987).

overalls; boxes of .22 bullets were found in his bedroom; a .22 bullet was found in the rented Lincoln, and a witness saw a .22 rifle in the Lincoln's trunk on September 11; the box of .22 bullets in Bryan's bedroom, the .22 bullet in the Lincoln, the .22 bullet loaded into the rifle at Bryan's house and the bullet fragments in the victim's head were all manufactured by the same company and appeared to be from the same source or batch;

—a pillowcase was attached to the victim's head with duct tape; three wads of duct tape were found near the body; a roll of duct tape was found in Bryan's room which matched the ends of one of the pieces of tape in the field; the duct tape from Bryan's room was consistent with the tape found in the field and on the pillowcase; duct tape found elsewhere in the Bryan house was not consistent with any tape at the crime scene;

—the victim's body was found in a secluded area near Bryan's house, in the same place where he had intended to kill an earlier victim;

—papers found in Bryan's room included: various documents in Bryan's writing purporting to be business agreements between Bryan and the victim, some of which were signed by him with both his and the victim's names; sheets of paper with the victim's signature written in different ways; checks from the victim's bank account made out to Bryan, some signed by the victim and some with the victim's name signed by Bryan [61]; a can of burnt checks from the victim's bank was found near the house.

Bryan argues that the circumstantial evidence above proves neither motive nor murder. He claims that the documentary evidence shows only his obsession with Beckham Farm One and his other business enterprises, and is evidence only of his mental illness; he also suggests that his conduct makes no sense if he is a sane murderer. On the contrary, the evidence is internally consistent, inconsistent with innocence, and excludes every reasonable hypothesis except that of guilt. This proposition is denied.

■ In Proposition XII Bryan claims that the unreliable "expert" testimony of hair analyst Melvin Hett violated his rights. Hett testified that a hair taken from the Lincoln's wheel cover in the trunk was consistent with the victim's hair. Hett specifically testified that hair comparison was not an exact science and could not be used to identify any individual. Hett spent three pages of trial transcript explaining the scientific process he used in hair comparison in this case. Although Bryan did not object to any of Hett's testimony, he urges the Court to review the alleged error for more than plain error, since trial counsel could not have anticipated any change in the law that would have supported an objection. No such change has occurred.[62] Hett's testimony was not plain error, and this proposition is denied.[63]

## ISSUES RELATING TO GUILT OR INNOCENCE AND SENTENCING

In Proposition XIII Bryan argues the introduction of irrelevant but highly prejudicial

61. Expert witness Peters determined that the victim signed some checks while Bryan forged her name to other checks and documents. Bryan argues that the FBI could not conclusively identify any signatures as the victim's. However, no FBI report was admitted into evidence. No evidence contradicts Peters's conclusions.

62. Bryan acknowledges that this Court has found hair comparison evidence admissible, *Crawford v. State*, 840 P.2d 627, 636 (Okl.Cr.1992), but urges this Court to reconsider in light of *Williamson v. Reynolds*, 904 F.Supp. 1529 (E.D.Ok. 1995). In that case the United States District Court for the Eastern District of Oklahoma held that similar evidence from Hett was not scienti-

fically reliable and should not have been admitted. *Williamson* is not binding on this Court. Bryan offers no other reason to review this settled area of law.

63. Bryan claims the effect of Hett's testimony was exacerbated by closing argument, where prosecutors twice argued the victim's hair matched the hair found in the Lincoln. While this argument overstated the evidence, Bryan did not object to it. Given the remainder of the evidence this argument alone could not have affected the outcome of the trial, and any overstatement in closing argument does not alter the fact that Hett's own testimony was circumspect and not improper.

evidence in both stages of the trial deprived him of a fair trial and a reliable sentencing proceeding. Bryan complains of several alleged errors in both first and second stage.

▮ Bryan first claims that documents found in his bedroom, including handwritten agreements and addenda describing his business deals with the victim, were irrelevant and should not have been admitted in the first stage of trial. He expressly complains about State's Exhibit 66, a handwritten addendum to purported agreements between Bryan and the victim, which included allegations that the trial court and some elected county officials had taken bribes in previous matters. Bryan objected to testimony about the content of most of these documents, and specifically objected that State's Exhibit 66 contained irrelevant prejudicial material. Prosecutors were only interested in the part of the exhibit showing that the victim owed Bryan money and offered to redact the offending names from the exhibit. Trial counsel refused this offer, stating that his objection was lack of relevance and prejudice and if the document were admitted the whole thing should come in. The prosecution tried to show that Bryan intended to force the victim to write him checks and execute promissory notes in his favor, and that he believed the victim owed him money or planned to present forged claims for money to her estate. Documents found in his room, especially those identified as written by him, which indicated he believed the victim owed him money or forged her signature on business agreements were thus relevant to prove motive and intent. While portions of State's Exhibit 66 might have been irrelevant and prejudicial, counsel explicitly declined to accept the remedy offered at trial. The prejudicial effect of State's Exhibit 66, and other documents introduced, did not substantially outweigh their probative value, and the trial court did not err in admitting the evidence.

▮ Bryan next complains of FBI agent Peele's testimony that the bullets from the victim, the Lincoln, the rifle, and Bryan's room all came from the same source, were manufactured in the same batch, and probably came in the same box. Bryan did not object to this evidence at trial and has waived all but plain error. Contrary to Bryan's argument, Peele defined the term "source", testified about the scientific procedure for lead composition comparison, described the comparison procedure he used for these particular bullets, and explained why bullets with the same composition are usually found in the same manufacturing batch. Peele's testimony provides more than speculation that the bullets came from the same box, and did not invade the province of the jury. A witness qualified as an expert by knowledge, skill, experience, training or education may testify as to an opinion if the witness's scientific, technical, or other specialized skill will assist the trier of fact to understand the evidence or determine a fact in issue.[64] Without objection, Peele testified to his specialized knowledge and experience in lead composition comparison. His evidence assisted the jury in understanding the evidence suggesting that the bullets in this case came, not only from the same manufacturer, but from the same metallurgical source and were probably found in the same box. Bryan suggests that lead composition analysis should not have been admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[65] but he has not shown that this type of materials analysis amounts to a novel scientific procedure which would trigger *Daubert* scrutiny.[66] A qualified witness assisted the trier of fact in an area of specialized knowledge. The trial court did not commit plain error in admitting this evidence.

▮ Bryan complains of two other opinions offered in the first stage. Bryan objected to Officer Farrell's opinion that burnt papers found in a can near Bryan's house were a checkbook from the victim's bank. Farrell testified regarding his experience, the procedures used to reconstruct the contents of the can and the numbers found on individual pieces of paper, as well as the

---

64. 12 O.S.1991, § 2702.

65. 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

66. *Daubert*, 509 U.S. at 585–86, 113 S.Ct. at 2792–93, 125 L.Ed.2d at 478.

paper's appearance. This evidence was more than speculation, and provided technical knowledge that assisted the jury in understanding the evidence. Bryan suggests he objected to Officer Briggs's statement that the cloth found at the crime scene with duct tape was a gag. Actually, Bryan objected when Briggs read an evidence tag identifying the cloth as a gag. This was not opinion testimony. The trial court did not err in permitting these statements.

 Bryan also complains of evidence introduced in the second stage to support the continuing threat aggravating circumstance. Bryan objected to witness McCannon's testimony that, approximately a year before this crime, Bryan attempted to hire him to dig 3′ × 6′ × 4′ holes on some farm property. The prosecutors argued that these holes were to be used to dispose of bodies. This evidence was irrelevant; that Bryan may have contemplated digging holes on the farm a year before this crime says nothing about whether he has a propensity to commit criminal acts of violence. Bryan also objected to witness Albert's testimony that, in 1989, after Albert successfully represented a client in a civil suit against Bryan, Bryan walked up and down on the sidewalk in front of his office every day for two or three months. Bryan never spoke to Albert, and did not threaten him or his employees in any way, but Albert felt unsafe. Bryan had not bothered Albert since 1989. This evidence was also irrelevant; a not overtly threatening, noncriminal activity which ceased four years before this crime is not probative of whether Bryan would commit acts of violence in the future.

 Finally, Bryan objected to witness Harris who testified that, in 1990, Bryan and his father watched and made an obscene gesture as Harris entered onto recently purchased farm property. The following day Harris discovered an unknown person had emptied 1000 gallons of propane from a tank

onto the farmland. Bryan also objected to Harris's testimony that, after an encounter with Bryan, Bryan hid and watched him work on a different farm in 1988, and an unknown person tampered with the property. While the evidence that Bryan watched Harris may be relevant to other evidence presented, the evidence of tampering by unknown persons on either farm, three and five years before this crime, is not relevant to any second stage issue. None of this evidence should have been admitted.

 After discounting the irrelevant evidence, sufficient evidence remains to support the aggravating circumstance of continuing threat. Bryan had a 1989 conviction for solicitation of murder, and the facts of that case were remarkably similar to the crime here. Two witnesses testified to a violent incident that occurred while Bryan was incarcerated before trial. Harris testified to a 1988 confrontation in which Bryan threatened Harris's life, urged his mother to get a gun, and engaged in a physical fight with Harris. Admission of the irrelevant evidence outlined above was harmless.

 In Proposition XIV Bryan argues he received ineffective assistance of counsel because trial counsel failed to present available evidence of his mental illness at any point in the trial. Bryan must show that his attorney's performance was so deficient he did not have counsel as guaranteed by the Sixth Amendment, and his defense was prejudiced as a result of counsel's deficient performance by errors so serious as to deprive him of a fair trial with reliable results.[67] In death cases, there must be a reasonable probability that, absent errors, the sentencer would conclude the balance of aggravating and mitigating circumstances did not support a sentence of death.[68] Bryan must overcome the strong presumption that counsel's conduct fell within a wide range of reasonable professional assistance and equaled sound trial strategy.[69] This Court will consider

67. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984).

68. *McGregor v. State*, 885 P.2d 1366, 1381 (Okl. Cr.1994).

69. *Hammon v. State*, 898 P.2d 1287, 1309 (Okl. Cr.1995); *Malone v. State*, 876 P.2d 707, 713 (Okl.Cr.1994).

whether, viewing counsel's challenged conduct on the facts of the case as seen at the time, it was professionally unreasonable; if so, we will ask whether the error affected the jury's judgment.[70]

Bryan claims counsel was ineffective for failing to present evidence of mental illness in the first and second stages of trial. While he was represented by OIDS counsel, Bryan was examined by a psychologist, Dr. Murphy, and a psychiatrist, Dr. Smith. Dr. Murphy examined Bryan on May 9, 1994, and determined Bryan had a psychotic thought disorder with paranoid schizophrenic symptoms, which could be either functional or organic in nature. Dr. Smith examined Bryan on March 6, 1994, and concluded he had an extensive paranoid delusional system along with fragmentation of thought and circumstantial thinking. Both doctors questioned Bryan's competence to stand trial and were listed on the witness list filed by OIDS counsel on May 25, 1994. On May 24, counsel filed a notice of intent to rely on the defense of insanity or mental defect. On June 24 Bryan underwent a brain scan which revealed "multiple focal areas of decreased perfusion".[71] On August 17, 1994, the trial court granted OIDS's motion to withdraw as counsel and substituted trial counsel. Trial counsel included Dr. Murphy, along with a copy of the brain scan results in his August 17 supplemental witness list, and indicated Dr. Murphy would testify to the results of psychological testing, his observations of Bryan, a review of Bryan's medical records, the results and interpretation of the brain scan, and the existence of organic brain damage. No actual evidence or diagnosis of organic brain damage appears in the record before this Court. Trial counsel did not offer any of the evidence above, nor did he raise a defense of insanity or mental defect.

Bryan argues that counsel should have offered evidence of his delusional mental state in the first stage as a foundation for an insanity defense or to show that he was incapable of forming the malice necessary to commit first degree murder. While both doctors believed Bryan was incompetent to stand trial, nothing in the record indicates a diagnosis that Bryan either did not know that his acts were wrong and could not distinguish right from wrong, or did not understand the nature and consequences of his actions.[72] During the various competency proceedings, including the retrospective competency trial, successive counsel admitted that Bryan was an intelligent man and understood the proceedings ·and charges against him, but argued that Bryan's delusions about and obsession with a failed business venture prevented him from aiding in his defense. Similarly, no evidence of mental defect shows that Bryan suffered from a diminished capacity such that he could not form malice. Bryan's cited cases all concern jury instructions where defendants allegedly could not form the necessary intent due to voluntary or involuntary intoxication. While it is possible that a delusional or paranoid state may give rise to a diminished capacity defense, Bryan cites no such cases and the record before the Court does not indicate that any such precedent would apply here.[73]

Bryan cites cases in which this Court has criticized counsel for failing to use available evidence of mental disorders. Both *Galloway v. State*[74] and *Smith v. State*[75] are distinguishable on facts. In *Galloway*, the defense presented no opening statement or evidence despite abundant evidence in the State's case of bizarre behavior. The trial court instructed the jury on insanity. This Court determined counsel was ineffective because the issue of insanity was raised and

**70.** *LaFevers*, 897 P.2d 292, 306 (Okl.Cr.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 820, 133 L.Ed.2d 763 (1996); *McGregor*, 885 P.2d at 1381.

**71.** Testimony at the retrospective competency hearing identified this as organic brain damage in areas of the brain which had atrophied or died due to poor blood circulation.

**72.** *Pugh v. State*, 781 P.2d 843, 843–44 (Okl.Cr. 1989).

**73.** Bryan unsuccessfully requested an instruction on murder in the second degree, depraved mind. However, the evidence presented at trial, and Bryan's defense of innocence, did not support such an instruction.

**74.** 698 P.2d 940, 941–42 (Okl.Cr.1985).

**75.** 650 P.2d 904, 906–08 (Okl.Cr.1982).

instructed on, and the State presented inadequate evidence of sanity, but counsel wholly failed to use the abundant evidence of insanity. We ruled that, had the evidence been introduced, it was substantially possible that the State would not have proved the defendant sane beyond a reasonable doubt. In *Smith* counsel called one expert who testified the defendant did not know right from wrong, but failed to call a State's witness who would have testified that the defendant was incompetent and insane at the time of the crime. Counsel knew that the witness had found the defendant incompetent to stand trial, but assumed since the witness had conducted the examination for the State and was subpoenaed by the State, her testimony would be unfavorable. This Court held such an assumption showed an extreme lack of diligence and could not be considered trial strategy where counsel decided not to contact the witness knowing she had relevant information but without knowing what she would say.

Here, no evidence of insanity appears in the record. Counsel was aware of the witnesses who could testify as to Bryan's mental state and knew what their evidence would be. Bryan's defense, conducted through cross-examination and other witnesses, was one of actual innocence. Counsel argued vigorously that the State's circumstantial evidence had not proved Bryan was guilty. Counsel's decision not to present evidence of mental illness in the first stage appears to have been a strategic decision made after investigating the available evidence of mental illness. Bryan has not shown that he was prejudiced by this strategic decision. From the record before this Court, the jury would have learned at most that he was obsessed with and had delusions regarding former business ventures, and that he believed the victim to be involved in those ventures. Given the other evidence before the jury, Bryan has not shown that the absence of evidence of mental illness affected the jury verdict so as to deprive him of a fair trial with reliable results.

▄▄▄▄▄ Bryan argues that, whatever strategic merit counsel's conduct may have had in the first stage of trial, there was no excuse for failing to introduce evidence of his mental state in mitigation during the second stage. His cited cases fully support his argument that other jurisdictions have held counsel ineffective for failing to investigate and present available evidence of mental illness in the second stage of capital cases; however, that is not the issue before this Court. The record shows that counsel had investigated Bryan's mental state and was aware of the available evidence of mental illness. The question is whether counsel made a strategic decision not to use that evidence. This Court will not second-guess trial strategy.[76] The Supreme Court has held that trial counsel may have strategic reasons to avoid evidence of psychological problems.[77] Such strategic reasons existed here. According to the instruction on mitigating evidence, Bryan still appeared to be claiming actual innocence and any suggestion of diminished responsibility due to mental illness would have undermined that claim. Nothing in the record indicates that any mental disability Bryan might have would prevent him from planning and carrying out a crime, and evidence that Bryan was obsessive, paranoid, and acted on delusions stemming from his business ventures might have convinced the jury he would be likely to continue this behavior. Given the other evidence of violent behavior, the jury could have thought this type of psychological problem indicated a propensity for future violence. Counsel's failure to present this evidence in mitigation appears to be tactical and made after reasonable investigation of the evidence. Bryan has not shown counsel's performance was deficient in either stage of trial, and this proposition is denied.[78]

---

**76.** *Cargle v. State,* 909 P.2d 806, 832 (Okl.Cr. 1995).

**77.** *Burger v. Kemp,* 483 U.S. 776, 774, 107 S.Ct. 3114, 3120–21, 97 L.Ed.2d 638 (1987) (evidence might open record to violent tendencies, prior convictions, lack of remorse); *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d

144 (1986) (evidence of violent prior convictions, ability to commit crime).

**78.** In Supplemental Proposition I Bryan argues that evidence adduced at his retrospective competency hearing supports his claim of ineffective assistance of counsel. Additional evidence of deteriorating mental health was offered through

## ISSUES RELATING TO SENTENCING

In Proposition XV Bryan argues that the jury instructions in his sentencing trial did not accurately instruct the jury on the manner in which it was to use and consider evidence in mitigation. He first claims the jury instructions failed to inform the jury that its findings regarding mitigating circumstances did not have to be unanimous. Bryan unsuccessfully requested several instructions on mitigating evidence and aggravating circumstances, but did not specifically request an instruction telling the jury that their findings of mitigating evidence did not have to be unanimous. He has thus waived review of all but plain error. Oklahoma does not require a unanimous finding of mitigating circumstances. Bryan concedes that this Court has consistently rejected this argument.[79] Bryan next claims the instructions given to the jury on the issue of mitigation permitted the jurors to ignore mitigating evidence altogether and seriously diminished the effect of the mitigating evidence presented in the case. Bryan complains of language in Instruction F which describes mitigating circumstances as those which "may be" extenuating or reducing the degree of moral culpability or blame. Bryan's requested instruction defining mitigating circumstances also included the "may be" language. He admits this Court has repeatedly held that "may be" reflects the correct constitutional standard and avoids any infringement on the jury's duty to determine individual punishment.[80] Finally, Bryan claims the trial court committed error when it failed to instruct the jurors that they could consider a sentence of life and life without parole even though they had found the existence of an aggravating circumstance. Bryan unsuccessfully requested an instruction informing the jury that they could impose a sentence of life or life without parole despite the existence of an aggravating circumstance. As this Court has often held, a life sentence may be given notwithstanding a jury finding of aggravating circumstances which outweigh mitigating circumstances, but such an instruction is not required.[81] Instruction C told the jury to impose a noncapital sentence if it had a reasonable doubt as to Bryan's guilt of the charges in the Bill of Particulars. Instruction E authorized the jury to consider imposing a death sentence upon a unanimous finding that aggravating circumstances outweighed mitigating circumstances. In summary, this Court has repeatedly rejected all

testimony of Bryan's sister, attending physician, and medical experts. However, this evidence does not alter our conclusion that counsel's failure to introduce evidence of mental health problems may have been reasonable strategy.

**79.** *See, e.g., Knighton v. State,* 912 P.2d 878, 896 (Okl.Cr.1996); *LaFevers v. State,* 897 P.2d at 309–10; *Malone v. State,* 876 P.2d at 715. The second edition of the Oklahoma Uniform Jury Instructions, Criminal, contains a definition of mitigating circumstances which specifically informs jurors that unanimous findings of any given mitigating circumstance are not required (OUJI–CR 2d 4–78). This instruction restates settled law. While it may assist future juries in their deliberations, failure to give such an instruction in this case was not error.

Bryan complains that the jury instructions on mitigating evidence were sandwiched among the instructions for aggravating circumstances, which required unanimity. The record shows that Instruction D does not mention unanimity; Instruction E defines aggravating circumstances and requires unanimity; Instruction F defines mitigating circumstances and does not discuss unanimity; Instruction G lists specific mitigating circumstances and does not discuss unanimity; Instruction H requires the jury to unanimously find at least one aggravating circumstance then unanimously find that it outweighs any mitigating evidence before considering the death penalty; Instruction I requires jurors to unanimously find an aggravating circumstance and reduce that finding to writing, but does not require written or unanimous findings of any mitigating circumstances; Instruction J requires a unanimous verdict for imposition of the death penalty, or life imprisonment with or without parole. The distinctions between aggravating circumstances and mitigating evidence are clear and unambiguous.

**80.** *See, e.g., Romano v. State,* 909 P.2d 92, 123 (Okl.Cr.1995); *Pickens v. State,* 850 P.2d 328, 339–40 (Okl.Cr.1993), *cert. denied,* 510 U.S. 1100, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994).

**81.** *See, e.g., Knighton,* 912 P.2d at 895; *Mitchell v. State,* 884 P.2d 1186, 1206 (Okl.Cr.1994). The second edition of the Oklahoma Uniform Jury Instructions, Criminal, includes an instruction that a jury may impose a sentence of life or life without parole even if the aggravating circumstances outweigh mitigating circumstances (OUJI–CR 2nd 4–80). While this may assist future juries in their deliberations, failure to give such an instruction here is not error.

three of these claims. This proposition is denied.

▮ In Proposition XVI Bryan contends the "continuing threat" aggravating circumstance as interpreted and applied in this case created the risk of arbitrary and capricious imposition of the death sentence. Bryan concedes that this Court has repeatedly held the continuing threat aggravating circumstance constitutional. We have specifically found that "the phrase 'the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society' is clear and does not require further definition." [82] Bryan offers no reason to reconsider well-settled law.

In Proposition XVII Bryan claims the evidence in aggravation was not sufficient to support the sentence of death. Bryan does not argue that the evidence presented at trial does not support the aggravating circumstances. Instead, he suggests that this Court should take into account his age, poor physical health and evidence indicating mental problems when reviewing the sentence of death. Bryan argues that his prior criminal conviction and other problems began after his mental and physical health started to deteriorate. He notes that for most of his life he was a good citizen, teacher, and businessman, and claims that for these reasons the death sentence is unwarranted.

▮ This Court's task on appeal is to independently review the evidence to determine if it supports the jury's finding of aggravating circumstances. [83] Bryan's prior criminal conviction for solicitation of murder supports the aggravating circumstance that he had been previously convicted of a felony involving the use or threat of violence to the person. That conviction and the circumstances surrounding it, along with evidence of death threats and altercations before and during incarceration, support the charge that Bryan would probably commit criminal acts of violence that would constitute a continuing threat to society. Instruction G informed the jury that mitigating circumstances included: (1) Bryan's contention that he did not commit the murder; (2) that he believes in God; (3) that he comes from a loving, caring and close family; and (4) that even if he committed the crime charged, his life could still be salvaged. Bryan's mother and sister testified as to his generous nature and financial support, his moral standards and religious beliefs, his peaceful nature, his employment history including school teaching, and the debilitating effects of his diabetes. Bryan also gave his version of the prison altercation, emphasizing his poor physical condition. Evidence supports the jury verdict. Even if this Court were so inclined, it may not substitute its own findings in place of the jury's where no error has occurred. In the mandatory sentence review, this Court determines that Bryan's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor, and that the evidence supports the jury's finding of aggravating circumstances. That is the extent of this Court's independent review. This proposition is denied.

▮ In Proposition XVIII Bryan claims he was denied a jury composed of a fair cross section of the community because persons over the age of seventy were systematically exempted from his jury panel. Bryan admits that this Court has consistently rejected this argument. [84] He offers no reason to reconsider those decisions. This proposition is denied.

▮ Finally, in Proposition XIX Bryan argues the accumulation of error in the case deprived him of due process of law and a reliable sentencing proceeding. This case was remanded and a retrospective competency hearing was held using the correct burden of proof. That violation of Bryan's due process rights has thus been cured. Bryan

---

**82.** *Malone,* 876 P.2d at 715–16; *LaFevers,* 897 P.2d at 311; *Mitchell,* 884 P.2d at 1208.

**83.** *Malone,* 876 P.2d at 717; *Battenfield v. State,* 816 P.2d 555–66 (Okl.Cr.1991), *cert. denied,* 503 U.S. 943, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992).

**84.** *Romano,* 909 P.2d at 106; *Ellis v. State,* 867 P.2d 1289, 1294 (Okl.Cr.1992); *Fox v. State,* 779 P.2d 562, 566 (Okl.Cr.1989), *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990).

raised no other issues requiring reversal either separately or cumulatively. The improperly admitted evidence in second stage was harmless. Where there is no error, there is no cumulative error.[85] This proposition is denied.

## MANDATORY SENTENCE REVIEW

 In accordance with 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances. Upon review of the record, we cannot say the sentence of death was imposed because the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.1991, § 701.13(C).

The jury was instructed on and found the existence of two aggravating circumstances: Bryan (1) was previously convicted of a felony involving the use or threat of violence, and (2) probably would commit criminal acts of violence that would constitute a continuing threat to society. Upon our review of the record, we find the sentence of death to be factually substantiated and appropriate.

Finding no error warranting modification, the judgment and sentence of the District Court of Beckham County is **AFFIRMED.**

LUMPKIN, J., concurs in results.

STRUBHAR, V.P.J., LANE and JOHNSON, JJ., concur.

LUMPKIN, Judge, concurs in result.

I agree with the results reached in the opinion. I write separately on three matters.

First, I once again urge this Court to adopt a unified approach when reviewing claims dealing with the sufficiency of the evidence. *See White v. State*, 900 P.2d 982, 993–995 (Okl.Cr.1995) (Lumpkin, J., Specially Concurring).

Second, I write separately to explain why we are addressing a supplemental proposition. Ordinarily, this Court will not address propositions which are not presented in a

timely manner in the Appellant's brief-in-chief. *See* 22 O.S.Supp.1996, Ch. 18, App. *Rules of the Court of Criminal Appeals,* Rule 3.4(F)(2). However, this Court remanded Appellant's case pursuant to *Cooper v. Oklahoma,* — U.S. ——, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) to determine if a retrospective competency hearing could be held; and, if so, to hold such a hearing using a constitutionally correct burden of proof. Such a hearing was held; and this Court's course of action is consistent with the scope of our authority set out in Rule 3.11(A).

Third, I do not agree with the Court's discussion of Supplemental Proposition V. The Court's decision in *Jackson v. State,* 811 P.2d 614 (Okl.Cr.1991), is not applicable to the situation presented here. The purpose of discovery is to provide the opposing party matters which may be used at trial and to ensure the party is put on notice of its existence. That was done in this case. The trial judge made the correct ruling.